# SUPREME COURT OF TEXAS.

## TERM OF 1873.

### GEORGE W. HONEY v. B. GRAHAM.

1. A proclamation by the Governor that the State Treasurer elect had absented himself from the limits of the State—not on public business and without leave of absence—leaving no bonded or responsible clerk, but leaving a man acting as such who, when called on to give the bond required by law, was unable to do so ; *held*, not sufficient to authorize the courts to infer an abandonment of the office.

2. The right to hold and exercise the functions of an office to which one is elected by the people, is regarded both as property and privilege, and the incumbent can only be deprived of his office in the manner pointed out in the 16th Section of the 1st Article of the Constitution.

3. Though the Governor may assume the existence of a vacancy in such an office, no case can occur wherein he will be authorized to adjudge the office forfeited.

4. The right of trial by jury exists in every case where it is charged that an office has been forfeited, and no emergency can arise which will deprive the claimant of this right, or which will authorize the Govenor in assuming judicial functions which do not constitutionally belong to him.

5. The power of the Governor to create a vacancy in an office exists only where the office is filled by the Governor's appointment, without concurrence by the Senate or election by the people, and the term of office is undefined by law.

6. The right to an elective office may be lost by nonuser or misuser, though a party continue to assert it, but the determination of the question whether it be lost or not is for the judiciary and not the executive.

APPEAL from Travis. Tried below before the Hon. J. W. Oliver.

On the thirtieth day of April, A. D. 1870, George W. Honey gave his bond and was duly qualified and commis-

1

sioned as Treasurer of the State of Texas. He continued to discharge in person the duties of the office until the twenty-third of April, 1872, when with his family he left the State, saying to several persons that he would be gone six weeks. He left his chief clerk, Burns, in possession of the office. Soon after Honey's departure the Governor notified Burns that he must execute a bond for the faithful administration of the office. The bond was not executed to the satisfaction of the Governor, and on the twenty-seventh day of May, 1872, the Treasurer's office was seized by military force and occupied by James Davidson, Chief of Police and Adjutant General of the State. Davidson acted in obedience to orders issued to him by Governor Davis, who on the same day issued a proclamation declaring the office of Treasurer vacant, for the following reasons, viz.:

"That George W. Honey, late Treasurer of the State of Texas, has absented himself from Austin, without the limits of the State of Texas, not on public business, and without having first obtained leave of absence from the Legislature while the same was in session, or from the executive during its recess, and has not left a bonded and responsible clerk, or a clerk who when by me required has been able to give a sufficient bond, in charge of the treasury of the State, whereby he has abandoned his said office and the same has become vacant."

He at the same time appointed B. Graham Treasurer; General Davidson put him in possession of the office, and ousted therefrom the employees of Honey.

On the same day Honey filed this suit against B. Graham, John D. Elliott, General Davidson, and others, for damages and a *mandamus*.

Subsequently the action for damages was abandoned as to all the parties, including Graham, and was dismissed as to all the parties except Graham. The case then pro-

ceeded to trial with no other parties than Honey and
Graham, and on no other question than the right of the
respective parties to the office.   Graham was commis-
sioned by the Governor as Treasurer of the State on the
day when the office was seized by General Davidson.
Three days before the day on which the office was seized
the chief clerk, Burns, tendered a bond as required by
the Governor, which was rejected, as the Governor stated
in his evidence, because "all the securities were not per-
fectly responsible."   After the seizure of the office by
Davidson, a committee was appointed during the trial by
the district judge to investigate the condition of the
treasury.   The report made by that committee illus-
trates no issue involved in the final decision of the case.

A. J. Hamilton, Hancock & West, and Chandler,
Carleton & Robertson, for the appellant. — 1. As to the
creation and tenure of the office of Treasurer, see Consti-
tution of the State of Texas, Article 4, Section 7; Article 4,
Section 21 ; Article 4, Section 20 ; Article 8, Sections 2, 4
and 6 ; Article 12, Section 41 ; and Article 1, Section 16 ;
Paschal's Digest, second edition, title "Treasurer," page
890, Articles 5282 to 5291 inclusive, as to the office and
duties of Treasurer ; see also Paschal's Digest, page 925,
title "Comptroller," Articles 5413 to 5432 inclusive.

2.   As to the duties of the chief clerk of the treasury,
and as to his bond, see the following:   Paschal's Digest,
Article 5291 ; General Laws Seventh Legislature, Chapter
153, page 247 (1858); General Laws Tenth Legislature,
second extra session, page 18, Chapter 27, Act November
15, 1864.

3.   Mandamus is the proper remedy. (Bradley v. Mc-
Crab, Dallam, 504; Banton v. Wilson, 4 Texas, 400;
Lindsay v. Locket, 20 Texas, 516; Kentucky v. Ohio,
24 Howard, 66, cited and followed in the Great Northern

Railroad case, decided at this term of the Supreme Court.)

4. When, as in this case, the executive has no power of removal, and, therefore, no power of creating a vacancy, he cannot be judge and jury both, but the fact of vacancy must be ascertained in accordance with law. (Keenan v. Perry, 24 Texas, 253; Hill v. State, 1 Ala., N. S., 559; Bowman v. Slifer, 25 Penn. St. R., 29; *Ex parte* Hennen, 13 Peters, 259; Lowe v. Commonwealth, 3 Metcalf, Ky., 213, bottom page; Page v. Hardin, 8 B. Monroe, 648; Brown v. Grover, 6 Bush, Ky., 1; Cummings v. Clark, 15 Vermont, 653; Johnson v. Wilson, 2 N. H., 202; People v. Fields, 2 Scammon.)

5. The assertion of the executive in his proclamation that the contingency authorizing him to appoint has happened, is no evidence whatever of that fact. (See Page v. Hardin, 8 B. Monroe, 648; Bowman v. Slifer, 25 Penn. St. R., 29; People v. Fitch, 1 Cal., 519; State v. Lusk, 18 Mo., 333; People v. Carrique, 2 Hill, N. Y., 104; Callahan v. State, 2 Stewart & Porter, 389; Bruce v. Fox, 1 Dana, 448.)

6. In ascertaining these facts, as an office is regarded in some respects as a species of property, the course of the common law must be followed. (Womack v. Holliday, 2 Ala., N. S., 31; 4 Bacon's Abridgment, title "Office," letter G, p. 29; 2 Blackstone's Commentaries, 263; *Ex parte* King; also, Collins v. Tracy, and *Ex parte* Hogg, all decided at the present term of the Supreme Court.)

7. The evidence in the cause adduced is wholly insufficient to establish, or even raise, a presumption of the existence of any one of the alleged grounds of vacancy. Mere absence, without any particular circumstance of aggravation, will never work a forfeiture of the office. (See Rex v. Corporation of Wells, 4 Burrow, 199.)

"Whenever an officer, who holds his office by patent, commits a forfeiture, he cannot regularly be turned out without a *scire facias*, nor can he be completely ousted or discharged without a writ of discharge; for his right, appearing of record, must be defeated by a matter of as high a nature." (7 Bac. Abg., letter M, p. 323.)

8. We have been cited to the following authorities by counsel for appellee, viz.: State v. Allen, 21 Indiana, 516; Leal v. Jones, 19 Indiana, 357; Kerr v. Jones, 19 Indiana, 351; and Hadley v. Board of Commissioners, 4 Black-ford, 116. Upon a comparison of the facts of these cases with the facts of the case at bar, these authorities will be found not applicable to the case under consideration.

9. A review of our Constitution and statutes will show that it is impossible that the framers of them ever intended to clothe the executive with power to take military possession of the civil offices of the State, declare incumbents elected by the people out of office, and put his creatures in. (Constitution of Texas, Article 1, Sections 7, 16 and 17; 2 Story on Constitution, Book 3, Chapter 37, title "Executive;" Federalist, No. 77, p. 351; Opinions of Attorney General Stanberry, August 30, 1861, p. 4; Kendall v. United States, 12 Peters, 615; Marbury v. Madison, 1 Cranch, 137, *et seq.*)

The abandonment must be acted on by the executive; but suppose it prove he was under a mistake, and there is no abandonment, shall the old incumbent lose his office through the mistake of the executive?

The judgment should be reversed, and this court should proceed to render such judgment as the court below ought to have rendered, restoring appellant to the office of Treasurer, from which he has been illegally driven.

*Wm. Alexander, Attorney-General,* for appellee.— What are the constitutional duties of the State Treas-

urer? "He shall receive and take charge of all public moneys paid into the treasury, countersign all warrants drawn by the Comptroller of Public Accounts, pay off the public creditors upon the warrant of the Comptroller of Public Accounts, and perform all such other duties as may be prescribed by law." (Constitution, Art. 4, Sec. 21.)

By the statute, he can receive public moneys on deposit warrants, and not otherwise ; and can pay them out on treasury warrants, and not otherwise. (Oldham & White's Digest, Arts. 1882, 1883.)

His constitutional and statutory duties are enforced by a penal sanction. (Penal Code, Ch. 3, Secs. 235 and 237.)

Which of his official duties (constitutional or statutory) can he perform when he is out of the State, and when he has left no bonded and qualified chief clerk in the treasury?.

The chief clerk is required to give a $25,000 bond, and even that did not authorize him to sign for the Treasurer. (Act of February 16, 1858, Ch. 153, p. 247.) Six months' residence is also required. He must be a registered voter. Even after having given bond and qualified, he could not, until January 11, 1862, "sign the name of the Treasurer by himself as clerk," save when "by reason of sickness, unavoidable absence" (no other sort of absence), "or other cause" (of course, other than sickness, or unavoidable absence), "the Treasurer's name may not be affixed by himself." (Acts of 1862, Ch. 64, p. 44.)

What are the rights, powers and duties of the Governor touching the office of Treasurer of the State of Texas? The Treasurer is declared by the Constitution to be an officer of the executive department, of which the Governor is the head. (Constitution, Art. 4, Sec. 1.)

As he must be commissioned, the Governor, under the Constitution, must ascertain who he is to commission. (Constitution, Art. 4, Sec. 19.)

The Governor must know who are the incumbents of the offices constituting the executive department. How could he "require information in writing from all officers of the executive department" otherwise? (Constitution, Art. 4, Sec. 7.)

If such be not the case, how is it possible for him to "take care that the laws be faithfully executed?" (Constitution, Art. 4, Sec. 10; see also the Louisiana case of Bovee v. Horren, and Kerr v Jones, 19 Ind. R.)

Under the general requirement, that he shall "take care that the laws be faithfully executed," he was bound to declare the office vacant, when *ex naturæ rerum* Honey had so absented himself, that he could discharge no one of the constitutional or statutory duties of the office.

The action of the Governor being within the scope of his executive authority, and outside the scope of judicial jurisdiction, cannot be attacked collaterally any more than it can be appealed from directly. (Facey v. Fuller, 13 Mich. R., 527; Aulanier v. State, 1 Texas.)

The second commission is conclusive. (Dubuc v. Voss, 19 La. An. R., 210.)

The Governor, whose duty it is to commission, is bound to officially know and decide who are the incumbents of the offices constituting the executive department. (Constitution, Article 4, Sections 1, 7, 21 and 10.) His decision is necessarily final and irreversible. (Keenan v. Perry, 24 Texas, 260.) Under the requirements of Section 10 he must know and decide when any office, especially of his own department, is vacant, whether by death, resignation or abandonment. He has, by proclamation, held that the office of Treasurer was vacated by Honey by abandonment. He has commissioned and recognized Graham as Honey's successor, and Graham has *user* of the office. (Aulanier v. The Governor, 1 Texas,

666 ; Facey v. Fuller, 13 Mich., 531. See also, by way of analogy, Luther v. Borden *et al.*, 7 Howard, 1.)

If the decision of the Governor was subject to revision by the courts, the record contains affirmative proof that it was correct in point of fact.

Honey was without the limits of the State. He left no bonded clerk. Graham is in office, and the State has not by *quo warranto* sought to oust him. The State alone by a direct proceeding for the purpose can evict—that is, under our Constitution. (Article 8, Sections 2 and 4.)

*Sheeks & Sneed*, also for appellee.—We do not claim that the Governor can create a vacancy in any of the other executive offices, but if a vacancy exists he has a right and it is made his duty to fill it. (Constitution of 1869, Article 4, Section 7.)

The power to fill a vacancy imposes the duty to inquire if a vacancy exists. (Hill v. The State, 1 Ala., N. S., 559.)

The commission gave the appellee a *prima facie* right to the office, and if he found it vacant he had a right to take possession of it and hold it until it was judicially determined that there was no vacancy.

But if he had found Honey in the office, refusing to give it up, he would have been compelled to have resorted to the courts for a determination of his rights. (Hill v. The State, 1 Ala., N. S., 559; 4 Blackford, 116; 19 Ind., 351; 19 Ind., 357; 21 Ind., 516.)

The Governor appointed appellee, commissioned him, as he had a right to do, and the appellee did not find Honey in the office, either in person or by a legal representative.

That Burns was not in any sense a legal officer is shown by the statutes and constitutional provisions cited by appellant. He can only be regarded as a stranger and

usurper, independent of Honey. (See also Constitution of 1869, Art. 22, Sec. 1.)

The question whether there was a vacancy or not can be determined by the courts as well after appointment as before. (Hill v. State, 1 Ala.; 21 Ind., 516; 4 Blackford, 116.)

Then the only question is whether there was a vacancy in contemplation of law or not.

A vacancy may be made by resignation, death, expiration of the term of office, abandonment, removal, or forfeiture.

Abandonment of an office is a species of resignation. (8 B. Monroe, 648.)

A man has abandoned his office when he goes away or does any other act that makes it impossible to discharge the duties of it, and leaves no competent deputy, assistant, or other representative recognized by law. (8 B. Monroe, 648, and Indiana cases above cited.)

Honey had done this, as is shown by the evidence in the case. He had forfeited his office by his illegal use of the public funds, and the evidence makes out such a case as would warrant the court in declaring his office forfeited if the appellee had found him in it and had been compelled to bring suit for the office. (21 Ind., 516; 4 Blackford, 116.)

WALKER, J.—A majority of the court have arrived at an opinion in this case which I am authorized to express. To this, however, may be added by my brother McAdoo his own reasons for the opinion.

The 1st Section of the 4th Article of the Constitution creates the office of State Treasurer, and makes it a branch or subordinate department to the executive, over which the Governor is chief. The 7th Section of the same article implies an authority in the Governor over

the different branches of the executive department. He is authorized at any time to require information in writing from any of the chiefs of this department concerning the business of their offices.

It may be somewhat difficult to determine the precise boundary line of this authority, or how far the Governor is himself officially responsible for the safe and efficient management of the several branches of this department.

The action of the Governor in the case at bar is not without precedent. Ohio, Mississippi and Louisiana, have furnished similar cases. The late Chief Justice of the United States, when occupying the executive office of Ohio, upon information duly brought to his notice, seized the treasury department and ejected a defaulting officer.

But mere precedent, to acquire the force of law, must in the first place rest upon the sound principles of law and reason ; it must be acquiesced in and uncontradicted by paramount authority.

No doubt is entertained of the authority of the Governor to appoint a Treasurer of the State when a vacancy exists in that office. The inquiry then to which we may safely confine this opinion is, was there a vacancy in the office of State Treasurer on the twenty-seventh of May, 1872 ?

What information we have on this subject aside from the other evidence found in the record, is contained in the Governor's proclamation of that date. To this State paper we must look for information as to the motive, reason and facts to sustain the judgment of the District Court.

Taking the proclamation of the Governor as true, aside from the legal conclusion that a vacancy existed in the office, do the facts justify such a conclusion?

The Governor declares in his proclamation, that George W. Honey, late Treasurer of State, had absented himself

from the limits of the State—not on public business, and without leave of absence — leaving no bonded or responsible clerk, but leaving a man acting as such who, when called on to give the bond required by law, was unable to do so. These are the facts stated in the proclamation, from which a vacancy was inferred, and the appellee appointed to fill the vacancy.

The proclamation contains no charge of malfeasance, misfeasance, fraud, or peculation against the appellant. A zealous effort, however, seems to have since been made to establish these charges against him. If true, they could in nowise justify the Governor in depriving the appellant of his office by forcible ejectment therefrom.

The 16th Section of the 1st Article of the Constitution reads thus: "No citizen of this State shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land."

The right to hold and exercise the functions of an office to which the individual may have been duly elected, may be regarded both as property and privilege, and therefore the incumbent can only be deprived of his office in the manner pointed out in the above quoted section of the Constitution. It may be safely admitted that more than one case might occur where the Governor would be authorized in assuming that an office was vacant; but no case can occur under our Constitution wherein the Governor would be authorized to *adjudge* an office *forfeited*.

Judgment belongs to the judiciary. A charge of forfeiture can only be made out on proof—proof sufficient to satisfy twelve unprejudiced minds.

To forfeit his right to an office, the incumbent must have done something sufficient in law to deprive him of the office; and the Constitution and laws secure to the person so accused the right of travérse—the right of trial—

and no power on earth can lawfully deprive him of these rights.

But it has been assumed on the argument of this case, that a great emergency existed requiring the removal of George W. Honey from the office of State Treasurer, and that the Governor, as in duty bound, promptly met the emergency.

Under a system of laws so well devised as ours, it is safe to assume that no such emergency can arise or cast itself upon the Governor as would authorize him in assuming power and functions which do not constitutionally belong to him.

In our opinion, the argument does the executive great injustice. The reason for his action is doubtless candidly stated in his proclamation, and there is here no assumption of any power to declare a forfeiture of the office.

There is no fact stated other than that, from which it must be inferred that the Governor acted upon the theory alone, that the appellant had voluntarily abandoned the office; and the majority of this court concurring in this opinion in nowise hold the executive responsible for any assumption of power on his part such as is assumed by appellee's counsel.

The power of the Governor to fill a vacancy, when one exists, is not disputed. The power to create a vacancy is denied by every authority, except where the office is filled by the Governor's choice of an incumbent without concurrence of the Senate or election by the people, and the term of office is undefined by law. In such case the incumbent holds at the pleasure of the executive, and may be at any time removed from the office. (Keenan v. Perry, 24 Texas, 253; Hill v. State, 1 Ala., 599; Bowman v. Slifer, 25 Penn. S., 29; 13 Peters, 259; Lowe v. Commonwealth, 3 Met., 213; Page v. Hardin, 8 B. Monroe, 648; Brown v. Grover, 6 Bush, 1; Cummings v. Clark,

15 Vermont, 653 ; Johnson v. Wilson, 2 N. H., 202; People v. Fields, 2 Scammon, 79.)

The argument in this case by appellee's counsel goes even beyond an assumption that the Governor may adjudicate a question of forfeiture ; it claims that the adjudication is final, and from it no appeal can be taken.

It is said by counsel, ''The Governor had cause to believe that the Treasurer had not only absented himself from the State, without leave, for an indefinite period, and that the person left in charge of the Treasury had never qualified or executed a bond, but that both the Treasurer and the person claiming to act as his chief clerk had been guilty of gross malfeasance, misuser and non-user. Shall the Governor calmly fold his arms, witness daily unlawful execution of so important a trust when he has power to fill a vacancy, and is required to take care that the laws be faithfully executed, simply because the Treasurer is liable to indictment and impeachment? Suppose the Governor had preferred charges against him (as was the case), no trial could be had at the first term, and if convicted at the next, he has the right of appeal, which would necessarily delay the case for twelve months or more. It is no answer to say that it is better the State should suffer these inconveniences and delays than that due course of the law of the land should not prevail.''

This argument is very bold—apparently very candid—but in that it assumes that the Governor may in any case deprive a citizen of his constitutional rights, it is not less bold and candid than it is false and dangerous. The ''law's delay and inconveniences'' may now and then prejudice an individual, or the State may suffer thereby, but the argument in this case is simply revolutionary, and if reduced to its legitimate sequence, is the justification of the mob, it is the logic of revolution, it is the license for illegal violence. The Governor never intended

this ; nothing in his proclamation convicts him of any such heresy. He has stated distinctly and unmistakably the reasons which led to his action, and any presumption which would lead to a different motive or reasons than those expressed would convict the Governor of insincerity to the people of the State, and found against him, in our opinion, a most unjust charge.

Certainly it would be better that every dollar in the State treasury should be stolen, the vaults and safes thrown into the river and the building reduced to ashes, than that the Governor should, in one jot or title, violate or impede the due course of the law of the land. The Governor, as our chief magistrate, we look to for an example of obedience to the law ; he is the sworn defender of the Constitution on which life, liberty, property and the pursuit of happiness depend.

Believing, as we do, that the Governor acted upon the facts stated in his proclamation, in view of the authority vested in him by the 7th Section of the 4th Article of the Constitution, how does his action affect this case ? He has neither adjudicated nor assumed to adjudicate any question of forfeiture, but he has acted upon a state of facts which, when duly and impartially considered, if they do not fully justify his action, certainly go a great ways in that direction in a moral point of view.

On the twenty-seventh of May, 1872, he finds the State Treasurer to be absent in a distant State, without leave from public authority, not sent for the transaction of any public business ; with him the principal members of his family, the intended period of his absence unknown, the community rife with rumors, however false they may have been, of fraud and peculation in the treasury ; the chief clerk in charge of the treasury without an official bond, the amount of money and property in the treasury largely in excess of the Treasurer's bond—these

were facts calculated to alarm, and no doubt did alarm, the executive, and especially considering his own constitutional responsibility over this department. That there was really nothing in these facts to have alarmed the Governor, could not, in the nature of things, be known to him at the time.

Looking at the conduct of the executive merely in a moral point of view, his conduct is not such as might not be expected in a prompt, vigilant and faithful public servant. But that he mistook the facts, at least so far as they relate to an abandoment of the office, and was thereby led to an undue exercise of power in appointing the appellee, we have no doubt.

And now we come to discuss the only question of real importance involved in this case. The authorities already referred to distinctly and unmistakably lay down the rule that there can be no abandonment of office without the intention to abandon it. (State v. Pritchard, Law Register, August number, p. 514, decided by Supreme Court of New Jersey.) The very word itself implies active volition; it involves a voluntary act. This voluntary act might be proven, if it existed; but it has not been proven in this case. No part of the evidence is strong enough to raise the presumption that the appellant, in his own mind, ever intended to abandon his office. In the case of Page v. Hardin, 8 B. Monroe, the law is so clearly stated in the opinion of the Chief Justice, and the case is so strongly analogous to the one at bar, that it would seem we ought to have but little trouble in deciding this case.

Hardin had been elected Secretary of State. The law required him to reside at the capital, which he persistently refused to do. The Governor declared the office vacant, and appointed Kinkaid to fill it. Hardin sued out a *mandamus* against Page, to compel the payment of his sal-

ary, and thus the question came before the courts. The Chief Justice says in his opinion:

"Acknowledging the respect which we sincerely feel for the opinions and character of the Governor, whose acts are now brought in question, as well as that which is due from this department to the official acts of every Governor, we are bound to inquire whether the vacancy assumed either actually existed by virtue of the facts alleged in the executive declaration and judgment, or was produced either by that act or the act of appointing a successor to fill it. * * * Conceding, without deciding, that an office may be made vacant by abandonment, and that there may be such evidence of it as to authorize the Governor to consider the office vacant, and to fill it by a new appointment, still, unless he can by his own will or judgment put an end to the rights of an officer, or to his continuance in the office, the concession would have no plausible support in law or reason, except upon the ground that there should be unequivocal evidence of the voluntary rejection or resignation of the office."

No such evidence existed in that case, nor is it found in the case at bar.

I readily conceive that a right may be forfeited or lost by a nonuser or misuser, though the party continue to assert it; but the determination of the question, whether it be lost or not, is not a question for executive determination; there must first be a judgment of amotion before the executive can fill the vacancy.

We therefore come to the conclusion, that the judgment of the District Court is erroneous, and that George W. Honey is entitled to the office of State Treasurer; and such is the judgment of this court, reversing the judgment of the District Court.

REVERSED AND RENDERED.

McADOO, J., *concurring.*—I believe the only question involved, or which could have been involved in this case, is, was the office of State Treasurer vacant at the time the appellee was appointed and installed as Treasurer? Did the absence from the State of the appellant, and the circumstances attending that absence, amount to an abandonment of the office? Was it his intention permanently to absent himself from the office, and to cease entirely to perform its duties, and to enjoy its emoluments? For I conceive that there can be no abandonment of an office, in legal contemplation, without the *intent* to do so ; and mere absence from the place of official duty, even for an unreasonable time, of itself merely, would not, I think, create a vacancy.

It seems that in this case, at the date of the Governor's proclamation, the appellant, together with his family, had been absent from the State for several weeks ; but aside from this fact there seemed to be no special facts pointing to the conclusion, that his absence was intended to be permanent ; on the contrary, he did not close the office, but left it in the charge of a clerk who, though not bonded as the law required, had, nevertheless, general charge of the office for some time before.

However reprehensible we may regard the fact that so important a public office was left by its incumbent in charge of an unbonded clerk, yet even this, in connection with the absence of the officer, does not in my opinion amount to an abandonment of the office.

But it is maintained by the counsel for the appellee that in the absence of a vacancy by intention of abandonment of the office, and where the office is left in the hands of an irresponsible clerk, and under such circumstances as to fully authorize the Governor to believe that the office was being grossly abused, to the great detriment of the public interest, the Governor had the power, and it was his

duty, as the head of the executive department of the State, of which the treasury is one of the branches, to seize the office, declare it vacant, and fill the vacancy by another oppointment. In other words, that the Governor has the power to remove an officer of the executive department, even the constitutional head of a branch of it, for a gross violation of the law governing his conduct as such officer, or gross abuse of the trust confided to him.

It is conceded that the Governor has the power to fill the office of State Treasurer whenever that office becomes vacant. But I cannot concede that under the 16th Section of the Bill of Rights the Governor can create a vacancy by the removal of an officer who holds his office by constitutional tenure. That section reads as follows : "No citizen of this State shall be deprived of life, liberty, property or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land." That "due course of the law of the land," in regard to the removal of officers, is clearly laid down by the Constitution of the State, and in the criminal laws of the State, by impeachment or indictment and conviction ; and as a result of such impeachment or conviction, a judgment of expulsion from office. And until such judgment of expulsion from the office, the officer is still the incumbent, and all his official acts, in conformity with law, are as valid as though such officer were unimpeachable and faultless.

Mere malfeasance or misfeasance in office, or even high crimes committed in office, do not of themselves vacate the office, but they do subject the incumbent to impeachment, or to indictment, trial, conviction and judgment of expulsion, by "due course of the law of the land." Under such a judgment the vacancy does occur, and cannot until then occur.

We are not called upon to decide whether or not the

course pursued by the Governor in treating the office as vacant, and in appointing the appellee to fill it, thereby subserved the public interest.

The questions presented by the record are purely legal ones, and we deal with them as such.

I concur in the just result reached in the opinion read by Mr. Justice Walker.

OGDEN, P. J., *dissenting.*— In monarchical governments the king and lords are the masters and the mass of the people are the servants.    There the law recognizes different degrees of social and political standing, the superior holding his high position and privileges above and independent of the people, and responsible alone to his superiors, while the king and nobles are considered the source and fountain of all power, rights and immunities; they hold their positions as a species of estates, to be exercised for their own benefit and at their will.    But in republican governments like ours the rule is supposed to be changed.    Here the people are regarded by the law as the sovereigns and source of all political power and authority, and the various offices nothing more than a delegated authority to perform certain duties for the interest of the whole, while the officer is emphatically the agent or servant of the people to perform such duties and services as they may have seen fit to intrust to his execution.

The office belongs to the people, and when they designate a particular person to fill that office and perform the duties enjoined, there is no transfer of the office by the people, but rather a transfer of his services by the incumbent to the people—his time and talents, so far as may be necessary to a full and faithful performance of every duty imposed, are no longer his, but the property of those in whose service he has voluntarily engaged.    He is responsible to the people, who have a right to demand and

know that he has faithfully discharged all the duties intrusted to his performance, and who have reserved to themselves the right and power, whenever their servants fail to perform the duties enjoined, to employ others who will do their bidding. And in the case of public officers the people demand of the party selected for an important trust, as a prerequisite to his assuming the duties of an office, the additional guarantee of a solemn oath that he will faithfully and impartially discharge all the duties incumbent on the position he seeks, and in many cases the further security of a penal bond against temptations to dishonesty and corruption.

Under such circumstances the party who seeks and accepts an important position and trust from the people, and then intentionally disregards his oath and neglects the interests and trusts confided to his care, proves himself devoid of conscience, unworthy of the trust reposed in him, and forfeits all claim he may have had to the position received from the people. He thereby commits a gross fraud upon the rights of the people which should of itself cancel and annul all authority conferred by virtue of any office he had falsely promised to fill.

Again, when a party accepts a public office and qualifies therein, he enters into a solemn contract, whereby, for a valuable consideration, usually in the form of a salary, he contracts and binds himself to perform certain duties (Parsons on Contracts, Vol. 1, p. 123); and if he fails to comply with the terms of his contract, or if he places himself in a position which renders a performance impossible, he thereby forfeits all rights he may have had under that contract, which, by his own acts, he has canceled. In such a case a public officer may be presumed to have resigned or vacated his office (Angel & Ames on Corp., 465), and the electing or appointing power may proceed to fill the vacancy without any judicial or other

investigation. (Dillon on Municipal Corp., 201.) This author announces, without qualification, as a general rule, that an office may be vacated by a constructive resignation by abandonment, and refers to Wilcox on Corporations as announcing the same doctrine. (See also 21 Ind., 522.)

Under these authorities it is clear that an officer may vacate his office by abandoning the duties of his office, without any intention of abandoning the office or the emoluments thereof. If he should prostitute his authority and the funds or property in his hands, which were entrusted to him solely for the public good, exclusively to his own use and benefit, and refuse to perform any and all duties pertaining to his office, he would as effectually have abandoned the duties of his office as if his resignation had been tendered and accepted.

But an office may be vacated by a constructive abandonment, when an officer accepts another incompatible office, or enlists in the army, or if he should embark on a voyage to the Indian Ocean, or, in short, when he voluntarily puts it out of his power to perform its duties, even without any intent or purpose of abandonment. And to me it appears a most fallacious argument to contend that an office cannot be abandoned without an intent, when every duty of that office is intentionally abandoned, and every obligation resting upon the office is totally disregarded.

In the case at bar I am unable to discover the necessity for a critical discussion of the word abandonment in order to a just determination of the questions before the court.

On the twenty-seventh day of May, 1872, the Governor, by proclamation, declared the office of State Treasurer vacant, and appointed B. Graham to that office. And now the only question presented by the record to be de-

cided by this court is, was the office of State Treasurer vacant on the issuance of that proclamation?

But before considering that question it may be proper to notice the position taken by counsel, that the Governor, by that proclamation, attempted to create a vacancy by the removal of a legally constituted officer, who was then filling the office, and justly entitled to the position to which he had been elected by the voice of the people. In answer, it may be said that it is not claimed by any one that the Governor has the power of removal, and no such claim could be maintained under the authority of the Constitution and laws of the State. The only authority given to the Governor in that particular is found in Section 7, Article 4, of the Constitution, which says: "If a vacancy occurs in any of the executive offices, by death, resignation, or removal, or from any other cause, during the recess of the Legislature, the Governor shall have power, by appointment, to fill such vacancy, which appointment shall continue in force until the succeeding session of the Legislature."

There is no pretense of the power to remove, nor any foundation for one, and I shall therefore treat that question as settled.

There is another question preliminary to the main one, which requires a passing notice. It is claimed on the one side, that as the Governor has the power to fill vacancies, he also has the power of adjudging when a vacancy exists; and as the Governor has the determination of that question, his judgment must be final, and that there is no power in the courts to review or revise that determination; while on the other hand it is contended that the Governor has no power to act until the question of vacancy has been in a manner judicially determined. Both of these positions are fully considered, and their fallacy exposed in Page v. Hardin, 8 B. Monroe, 669, and the true rule

is there established, which accords to the Governor, primarily, the power to determine the question of vacancy in deciding in regard to his own action, and that whenever, in his opinion, a vacancy exists, he, of necessity, must have the power to fill that vacancy, but his acts in that particular are the legitimate subjects of judicial investigation.

There is no law to measure the amount or character of evidence the Governor must have before acting, and none to govern or control his discretion in the matter, other than the revisory powers of the courts.

And again, it is claimed that no other evidences of a vacancy can legally be shown in this case than that specified in the Governor's proclamation. But that position cannot be tenable, for the reason that the Governor is not required to issue a proclamation, or give any evidences or cause for his actions. He acts upon his own judgment, and cases may readily be supposed where it would be unsafe and impolitic for him to give any excuse or reason for his acts. I am decidedly of the opinion, that if no one of the facts stated in the proclamation were true, and yet if upon a judicial investigation it should be ascertained that from any cause a vacancy actually did exist, still the action of the Governor should be sustained by the courts.

The Constitution says, that when a vacancy occurs he shall have the power to appoint. Then the only power of the courts extends to the inquiry in regard to a vacancy, and it is wholly immaterial how that vacancy occurred, or whether the Governor knew it at the time of making the appointment or not; but if there was a vacancy at the time of the appointment by the Governor from any cause, his acts in that particular should be sustained. The main inquiry, therefore, presents itself, was the office of State Treasurer vacant on the twenty-seventh of May,

when the Governor assumed to make the appointment?
And in order to a proper understanding of the whole
question it is necessary to consider what are the duties
and responsibilities of the State Treasurer under the Con-
stitution and laws of the State.

By the terms of the Constitution it is made his duty to
receive and take charge of all public money paid into the
treasury; to countersign all warrants drawn by the
Comptroller of Public Accounts; to pay off the public
creditors upon the warrants of the Comptroller, and to
perform all such duties as may be prescribed by law.
And the statute further requires that he shall keep a true
and methodical account of all receipts and disburse-
ments; shall exhibit to the Governor or Legislature an
exact statement of the affairs of the treasury whenever
required, and shall at stated periods have a complete set-
tlement with the Comptroller of all moneys received and
paid out; he shall procure a strong iron safe or safes in
which shall be deposited all moneys or dues received by
him on account of the State. These are some of the im-
portant duties of the State Treasurer which he has bound
himself by oath and bond faithfully and impartially to
perform, and a neglect of any one of which would sub-
ject him to impeachment or removal, and in the strict and
faithful performance of which every citizen of the State
is directly interested, since without a treasury honestly
and faithfully guarded and impartially administered, the
government itself could not exist, the laws could not be
executed, and society would be thrown into a state of
chaos, so that no one would be secure in life, liberty or
property.

It should also be understood that these trusts, so vital
to the interests of the people, and so necessary to the ex-
istence of the government, are conferred upon the Treas-
urer because of the confidence reposed in his personal

ability, integrity and faithfulness, and they have a right to demand that whenever there is an official duty to be performed, it shall, excepting under extraordinary circumstances, be promptly executed under the immediate personal supervision of the person upon whom they have bestowed their confidence.

There is perhaps no officer in the State in whom so much confidence is necessarily reposed as the Treasurer of the State, who from the nature of his office and the duties imposed should if possible be ever present as a faithful sentinel to guard the treasury of the people and to see that it is not prostituted to individual uses or speculation. It is true that a large bond is required of the Treasurer as a security for the faithful performance of his duties, but that bond is very insignificant when compared with the amount of property and funds entrusted to his care, so that without the personal honesty and constant personal supervision and watchfulness of that officer the people have really no guarantee that their rights are not being sacrificed and their money squandered.

From these considerations, I am of the opinion that the State Treasurer has no right under the law to abandon for a day or an hour the personal supervision of his entire department, unless demanded by a consideration for the health of the body or mind. No considerations of private interest, speculation or pleasure should be regarded as forming any excuse for neglecting any duty which he owes to the public. The law authorizes the employment of all necessary clerks and assistants to render his labors comparatively light, but it demands his constant personal supervision. He is authorized to employ one chief clerk, who, after giving bond and taking the oath, as prescribed by the Constitution, "may sign the name of the Treasurer, whenever, by reason of sickness, unavoidable absence, or other cause, the Treasurer's name may not be

affixed by himself" (Paschal's Digest, Article 5291), clearly indicating that sickness or unavoidable absence only will excuse the failure of the personal supervision of the Treasurer.

There is one other question raised by the pleadings which should be noticed before making an inquiry into the facts of this case. The Governor, by his proclamation, declared that the appellant had vacated the office of State Treasurer, and appointed another to fill the vacancy. B. Graham, the newly appointed Treasurer, in the absence of the appellant, got possession of the office, and was attempting to exercise the duties pertaining thereto, when this suit was brought. Graham was in possession, and appellant sued out the writ of *mandamus* to eject him. He therefore assumes the affirmative, and must establish, by satisfactory proof, a paramount right to the office, before he can claim from the courts a judgment in his favor; and he must show something more than his election and qualification, since that is not the issue to be decided; the true issue being, not whether he had been elected, but whether he had not vacated the office after the election.

The law authorizes the Governor to appoint to fill a vacancy, and under that law the Governor has made the appointment; and *prima facie* that appointment establishes the fact of the vacancy, and the legality of the appointment, which should stand until the appellant shows, by satisfactory evidence, that at the time of the appointment by the Governor, he had not vacated the office.

This question was ably considered in the case of Leal v. Jones, 19 Indiana, in which Justice Perkins, in delivering the opinion of the court, says:

"When it appears *prima facie* that acts have occurred subjecting an office to a judical declaration of being vacant, the authority to fill such vacancy, supposing the

office to be vacant, may proceed, before procuring a judicial declaration of the vacancy, to appoint or elect, according to the forms of law, a person to fill such office ;. * * * and if such appointed person finds the office in fact vacant, and can take possession unmolested by the former incumbent, he may do so ; and so long as he remains in possession he will be an officer *de facto;* and. should the former incumbent never appear to contest his right, he will be regarded as an officer *de facto* and *de jure.* But should the former incumbent appear, after possession has been taken against him, the burden of proceeding to oust the then actual incumbent will fall upon him."

This case, I think, furnishes the correct rule by which the rights of the parties in this case are to be determined. The appellant must establish the fact that he had not vacated the office, or he should fail in this proceeding.

And now what are the facts of this case as shown by the record, and by which appellant claims that he has established his right to the office of State Treasurer, and to disprove the presumption, raised by the Governor's appointment, of a vacancy?

On the twenty-third of April, 1872, George W. Honey, being then the State Treasurer, left the State for the city of New York, to be absent for an indefinite period, or at least for the period of six weeks—not on business connected with the interests of the treasury or the State, but on a trip of pleasure and private business. He left the treasury in the possession and under the control of J. H. Burns, a person without oath or bond as the law requires, . and who was really responsible to no one for any neglect of duty or misapplication of the funds or property belonging to the State. After Honey had been absent from the State for several weeks, the Governor, whose duty it is to see that the laws are faithfully executed, for reasons

satisfactory to himself, and which may be wholly immaterial in this case, demanded of Burns, who had been acting as chief clerk, a bond for the faithful discharge of his duty as such, and on his failure to furnish such a bond as the Governor was willing to approve, he was regarded by the Governor as an intruder in the treasury department, and the office of Treasurer was declared vacant.

The statute creates the office of Chief Clerk of the Treasury, and provides that he shall give a bond in the sum of twenty-five thousand dollars, and the Constitution requires that all officers of the State, before they enter upon the discharge of the duties of an office, shall take and subscribe to the constitutional oath. Neither of these requirements had been regarded by the person who assumed to act as chief clerk, and until he had done so he had no legal authority to sign the Treasurer's name or perform any of the duties of chief clerk.

It may be true that while he assumed to act as chief clerk, and while he was recognized as such by the executive, he might be regarded a *de facto* officer; but so soon as his failure to qualify became known, or his authority to act was disputed by the executive, he could no longer act in that capacity, and if he attempted to do so he was liable to be treated as an intruder. Here, then, we have some of the facts upon which the Governor acted in considering the office of Treasurer vacant. Honey had been absent from the State for weeks, leaving Burns as acting chief clerk, who had failed to qualify in any particular, and without any known responsibility, in possession of the treasury containing near a million of dollars and other property of very great value, and without any legal authority to receive or to pay out to the creditors of the State one dollar.

These facts alone, in my judgment, were sufficient to

fully justify the Governor in considering that office vacant, and in the appointment of a proper person to take charge of the property of the people until the meeting of the Legislature. It is not true that the Treasurer is responsible upon his bond for the malfeasance or misfeasance of his chief clerk, and especially if he exercises ordinary care in selecting a proper person for that position. (Sher. & Red. on Neg., 215), as the doctrine of *respondent superior* does not apply to such cases.

Upon the facts here noticed I am not willing to sanction a decision which will declare, in effect, that there is no *prima facie* evidence of an abandonment of the duties of the office of Treasurer, and that the Governor had no authority to decide that there was a vacancy, or to make the appointment. In my judgment the duties of the Governor, and the heads of each of the executive departments, are such that neither can leave the State for any considerable length of time on business disconnected with their offices, or the general interests of the State, and without leaving a legally constituted officer to perform their duties, without abandoning their duties, and rendering their offices liable to be declared vacant. There are too many vital interests depending upon the prompt daily performance of the duties of these offices to sanction any unnecessary relaxation or abandonment for private gain, or luxurious ease. I wish not to be understood as the special defender of the Governor in the discharge of my official duty, but simply as announcing what I consider a correct interpretation of the laws and the duties of public officers.

I have not noticed all of the reasons that may have existed in the mind of the Governor for considering the office of State Treasurer vacant, but only such as in my judgment are sufficient to authorize the action of the executive, and which constitute a *prima facie* right in

the appellee to the office he now fills. But the appellant has brought this suit, alleging these facts, and the legitimate presumptions arising therefrom, to be in fact untrue, and claims not to have abandoned the office or the duties thereof. But has he established by proof any of these allegations, or succeeded in rebutting the presumptions raised by the facts as they originally existed? Has he established the fact that he did not abandon his duties as Treasurer of the State, and commit their whole performance to a person unqualified under the statute? Has he proven that, as Treasurer, he has safely kept the moneys of the State within the vaults of the treasury? Has he proven that his books have been truly and methodically kept? Has he promptly made his periodical settlements with the Comptroller, or has he disproven, or attempted to disprove, the evidences of speculation in the public funds, either by himself or his confidential clerk? I think he has totally failed in every particular, and left the contrary fully established by the proof of appellee. The large amount of uncanceled warrants found in the treasury, for which no explanation was attempted to be made, is to my mind quite conclusive, that they were there for speculation, or at least they raise a sufficiently strong suspicion of that fact to require explanation. The deposit of nearly thirty thousand dollars in the banks, when creditors of the State could not get a dollar, is a fact not well comporting with a strict performance of official duties. It is but just to appellant to say, that it is possible all these facts may be susceptible of explanation in full harmony with an honest intent, but as yet they are unexplained, and do not accord well with a denial of the abandonment of the duties of the office.

Under the foregoing view of the law and the facts of this case, I think the judgment of the court should be affirmed, and I can consent to none other judgment.