# Supreme Court of Texas

No. 21-1045

Texas Department of State Health Services; John Hellerstedt, in his official capacity as Commissioner of the Texas DSHS

*Appellants*,

v.

Crown Distributing LLC; America Juice Co., LLC; Custom Botanical Dispensary, LLC; 1937 Apothecary, LLC,

*Appellees*

On Direct Appeal from the
345th District Court of Travis County, Texas

JUSTICE YOUNG, joined by Chief Justice Hecht, Justice Devine, and Justice Blacklock, concurring.

The Texas Constitution refers not to "due process" but to "the due course of the law of the land."[1]  The Court today "conclude[s] that the due-course clause does not protect the interest that the plaintiffs assert," *ante* at 2, and I agree.  But what *does* that clause protect—and how does it do so?  We still do not really know, even as we approach the sesquicentennial

---

[1] As I discuss in more detail below, *see infra* at 31, our Constitution's Bill of Rights has *two* due-course clauses.  As in the Court's opinion, my references to "the due-course clause" are to Article I, § 19.

of our current Constitution. To the extent we have a due-course framework, it is that the due-course clause means what the federal due-process clause means . . . except when it means something else.

We are therefore fortunate that we can resolve today's case with comparative ease. As I describe in Part I below, *regardless* of the standard that we apply, our judgment would be the same, which means that we can avoid saying much about the scope of the due-course clause. That condition will not last long, though. The very fact that the lower court used the Texas due-course clause to invalidate the statute here illustrates why we should soon expect cases that require more from us. We must be ready when those cases come, and in today's respite, we should take the perspective of Aesop's ant rather than his grasshopper.

To that end, in Part II, I explain why I believe that our precedents do not go much beyond what has permeated most of our jurisprudence: the unadorned assertion that the Texas due-course clause is essentially the twin (the junior twin, to be sure) of the federal due-process clause. Our recent decision in *Patel v. Texas Department of Licensing and Regulation* endorsed this view, with a caveat: "[T]he Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States Constitution." 469 S.W.3d 69, 86 (Tex. 2015). But *Patel* considered only how the courts should conduct the rational-basis test when the due-course clause applies; *Patel* did not address *whether* the due-course clause applied. The parties assumed that it did for purposes of summary judgment and on appeal, and the Court therefore similarly assumed that the due-course clause's substantive reach extended at least as far as the interest asserted in that case. *See ante* at 9 n.16. Accordingly, the

2

question of the due-course clause's definitive scope necessarily remained as open after *Patel* as it was before it.

I do not believe that we will have the luxury of kicking the can down the road much longer. Unlike *Patel*, today's case involves the disputed question of the due-course clause's scope. But we cannot provide much of an answer because all roads lead to the same destination: that the clause does not protect the asserted interest. Future cases will require us to make harder decisions based on analysis of what the due-course clause meant in 1876 and whether there is any good reason for it to mean anything different today.

Thus, in Part III, I offer some preliminary discussion of one possible reading of the due-course clause: that it operates as an important procedural and structural limitation, not as a repository of distinct substantive rights. This approach may remain faithful both to our precedents and to the due-course clause's text, yet it has received relatively little analysis or discussion. Perhaps it is wrong, but I would hesitate to reach a different result without thoroughly considering a process-based reading of the due-course clause.

To develop this idea, I first accept the premise, so often stated (even if superficially) in our cases, that our 1876 due-course clause was meant to encapsulate the same principles as the 1868 federal due-process clause. I then ask the question that we have never really examined—what does such a tandem relationship really mean? It is at least possible that the People of Texas in 1876 intended our State's government to be bound by fixed notions of due process *regardless* of what U.S. Supreme Court cases might eventually say about the federal clause. And it is at least possible that those who ratified our Constitution

3

thought that such a system would protect liberty *more* than a regime in which judges are the chief expositors of rights through new interpretations of the due-course clause. After all, far more than the U.S. Constitution, the Texas Constitution is vigorous in *directly* expressing a multitude of concrete, judicially enforceable rights.

In Part IV, I conclude with a brief discussion of the kind of tools that I think will facilitate this important work. That coming endeavor, I hope, will help us confirm, refute, or modify the hypothesis that I have sketched. I am open to *any* outcome that faithfully reflects the original meaning of our constitutional text.

It is hard to overstate the importance of getting the due-course clause right. Reading the text too broadly risks judicial self-aggrandizement. By larding more content into that phrase than it properly contains, we would intrude upon the political branches' roles and threaten the vitality of self-government. Reading it too narrowly, by contrast, risks sacrificing vital rights that the People have removed from the quotidian realm of the political process—rights that courts must protect from fleeting majoritarian whim.

I therefore write separately to describe the analytical process that I think is necessary before we can give a reliable and predictable meaning to this vital provision of our Constitution. Such analysis is necessary because our cases, piled one on top of the other, have rarely, if ever, paused to examine their foundations. We cannot keep building—at least, not safely—without checking those foundations. I hope that in coming years the lower courts, able counsel, amici, and scholars will focus on the constitutional text, history, and structure so that we can systematically articulate what the People of our State meant by "the due

course of the law of the land."

## I

Today's holding breaks no new ground and relies on principles that no party has challenged. I can therefore gladly join the Court's opinion and judgment, particularly because *no* due-course framework would authorize the judiciary to enjoin the enforcement of the statute at issue. As troubling as the current imprecision in our due-course clause jurisprudence may be, it at least does not prevent us from resolving this case. I thus begin by briefly sketching *why* I think that the result is the same regardless of whether we apply any of four potential approaches:

- traditional rational-basis analysis, which has largely been the same in federal and Texas courts;
- the "so burdensome as to be oppressive" test used in the particular context identified in *Patel*;
- no-protectable-interest review based on our muddled precedents about what qualifies as a liberty or property interest that the due-course clause substantively protects; or
- no-protectable-interest review because the due-course clause does not *itself* protect such substantive rights, but instead ensures a rigorous procedure to protect substantive rights that some other source of law recognizes.

## A

***Rational basis.*** Assuming for argument's sake that the ordinary rational-basis test applies, I find that this statute fully satisfies it. When a challenge to legislation comes to court, the executive-branch official who defends the law—whether the Attorney General or a locally elected official or anyone else—need not prove up some precise "purpose"

5

or "interest." The legislative branch's work does not fall to the judiciary's ax merely because the executive fails to argue forcefully or artfully enough. Anything else would threaten the separation of powers. Valid legislation would fall because of litigation strategies (including the possibility of *purposefully* weak defenses) in particular cases.[2] Such a regime would place at risk the very concept of self-government because the work of the People's representatives could be erased if a single lawyer in a single court fails to identify and prove an "interest" that satisfies a single judge, whose factual determinations are generally given great deference.

So the question here reduces to whether there is *any* rational basis for the particular actions taken by the legislature. The answer is surely yes. *Every* aspect of smokable hemp can be regulated to the point of proscription. Appellees admit as much. Despite having no obligation to do so, the legislature has taken various steps—some small, some large—to loosen the law. It is not irrational for the legislature to be tentative and to choose to proceed at a different pace than might seem logical in the abstract.[3] Our Alcoholic Beverage Code is no model of pristine logic but is instead the work of compromise and experience over many decades (and the source of frustration for just as long). It would be surprising indeed, then, if the law governing smokable products like

---

[2] I speak in this paragraph of general principles—I do not suggest that any parties or lawyers in *this* case have done anything short of their duty to this Court and to their clients.

[3] Of course, as I further discuss below, the due-course clause is not the entire Constitution. Governmental actions may violate *other* provisions (including our equal-protection clause, *see* Tex. Const. art. I, § 3, which prevents arbitrarily disparate treatment of our citizens). The only challenge before us, however, arises under the due-course clause.

hemp would emerge fully formed and perfect, like Athena springing forth from Zeus' head.

The analogy to baby steps—tentative, faltering, occasionally backward—is more reasonable, and better reflects how nearly all law has developed. Even as the legislature eliminated certain restrictions, therefore, it retained others—such as prohibiting the product's manufacture in Texas. If nothing else, it would be rational for the legislature to strike the balance it has here—allowing purchase and use, but not manufacture—to respect individual citizens' rights while refusing to countenance the *creation* of a smokable product that the legislature may regard as harming the public health.

Beyond that, it would be entirely rational for the legislature to account for the potential legal consequences of allowing the activities that Appellees claim a right to undertake. At least sometimes, authorizing conduct today makes it harder for the legislature to change its mind tomorrow. *See, e.g.*, *House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657 (Tex. 1965) (finding a "due process" violation in part because, in the specific context at issue, "once [a legislative privilege] is granted, it cannot be taken away except for good cause"). As the Court observes, Appellees make the argument that the regulatory program's history here requires the courts to view them as having a vested right that cannot readily be restricted. *Ante* at 29–31. The Court properly rejects that argument, which miscasts the regulatory history. *Id.* at 31. The Court does not hold that a *different* regulatory history—one in which the demanded activities *had* been allowed for some set period of time—would necessarily require a different result (particularly given the *kind* of activity at issue). *Id.* at 28. The point I make is that the

7

legislature's only way to *ensure* that the State's public policy would not be bound is to avoid treading too quickly into uncertain terrain. Hesitation, as frustrating as it sometimes may be, is therefore both sensible and *rational*.

Under this standard, a baby-steps approach is at least enough to preclude judicial invalidation of a statute under the due-course clause, whether the State formally asserted the "interests" at trial *or not*.

**B**

***So burdensome as to be oppressive***. Assuming for argument's sake once more that it is the *Patel* standard that applies, I again do not see how the legislation would fail to meet it. The legislature has no obligation to authorize *any* of the desired commercial transactions at issue here. Its choice to allow some previously forbidden conduct may lead it in time to allow more. As a matter of law, it is not "burdensome" or "oppressive" for the legislature to leave intact the challenged restrictions. Unlike the eyebrow threaders in *Patel*, *see* 469 S.W.3d at 90 (disqualified from their profession absent compliance with objectively burdensome regulatory mandates), the legislature has left room for Appellees to participate in the affected industry; indeed, the legislature has expanded the opportunities for them to do so. When Appellees themselves recognize that the legislature could rationally have been *more* restrictive, it is hard to see how the judiciary could have authority to force the legislature to be *less* restrictive.[4]

---

[4] Even in the context of *heightened* scrutiny, for example, the U.S. Supreme Court has held that an insufficient rationale for a distinction justified imposing a *greater* restriction on everyone rather a *lesser* restriction on some. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698–1700 (2017).

I cannot see how the Court could deem the statute at issue to violate *Patel*'s standard without dramatically changing that standard—and at the same time dramatically increasing the judiciary's role in policymaking.

## C

***No protected interest***.  Another way to reach the same result is the one that the Court follows: no longer *assuming* for argument's sake that one standard or the other applies, but instead concluding that neither of them applies because no interest exists that the due-course clause protects in the first place.  If a given interest does not have substantive protection, then it cannot be irrational or oppressive for the legislature to prohibit that interest.  Thus, even if we were to apply rational basis to *any* governmental restriction, the outcome here would be the same.

## D

***Due course as a procedural limitation.***  Another possibility is that the due-course clause does not protect producing smokable hemp for a fundamentally different reason: not that the due-course clause offers no substantive protection for smokable hemp in particular, but that it offers no freestanding substantive protection in general.  That approach might be linked most naturally to the due-course clause's text—that is, that any substantive interest that is *otherwise unprotected* by the law may be extinguished so long as the deprivation follows the due course of the law.

If—*if*—that reading of the due-course clause is correct, then this case would be easy.  For a court to find a *substantive* right that must be protected, some exogenous source of law—not the due-course clause

9

*itself*—must provide that substantive sweep. Appellees here invoke no other law.

Of course, the due-course clause need not be a font of substantive law for it to protect Texans. The clause would still bite at the government with teeth if the government denies its citizens the procedural fairness that they are owed. *See, e.g., Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 268 (Tex. 2019); *id.* at 270–71 (Blacklock, J., concurring) ("[A]rticle I, section 19 of the Texas Constitution prohibits the government from affirmatively misleading people about their procedural rights and then blaming them for not knowing better."); *see also, e.g., Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 908–10 (Tex. 2021) (noting the substantial procedural protection guaranteed by the due-course clause despite the absence of substantive protections).

Thus, the due-course clause always remains in play even when there is no protected underlying substantive interest. Actual *enforcement* of a law by the government provides the clearest illustration. If the government were to use this challenged law, for example, the government could not disregard the due-course clause's procedural requirements. Even though the legislature has no obligation to permit the manufacture of smokable hemp, the government may not, upon an official's whim or error, destroy manufactured products or impose a punishment. For example, Appellees' due-course right to prove that their products *comply* with the law (whether because they do not include hemp at all or because the hemp ingredients do not cross any statutory red line) does not flow from a due-course protection of the right to manufacture smokable hemp. Instead, the due-course clause operates independently—to protect any citizen from an unfair trial or

10

governmental proceeding. *That* role remains powerful despite the Court's conclusion that manufacturing of smokable hemp *is not itself* protected by that clause, and would remain powerful even if the due-course clause had no substantive scope.

One serious, sensible, and obvious objection to this potential reading of the due-course clause is its potential to leave some important liberty interests substantively unprotected altogether. As I discuss in more detail below, there may be less to this objection than meets the eye. One fundamental difference between the U.S. Constitution and the Texas Constitution is the comparative ease with which Texans can enshrine and have enshrined specific rights into our Constitution. *See infra* Part III.B. The Texas Constitution is far more overtly a liberty-embracing charter than its federal analogue. Consequently, there is far less *need* to find discrete rights within the phrase "due course of the law of the land." Thus, if—again, *if*—the due-course clause requires that substantive rights be exogenous to the due-course clause itself, the Texas Constitution has a far greater supply of such exogenous sources of liberty than the U.S. Constitution.

\* \* \*

I do not claim that these approaches are either exhaustive or mutually exclusive. There may well be others that we should consider in a proper case, and they may overlap to some degree. To the contrary, my point is that we do not *need* to choose any particular approach because *none* of them would lead to affirming the judgment below. That strikes me as enough for today's dispute.

We will not be able to be tentative or hypothetical in coming cases, which will require far more from us. Before proceeding to discuss how I think we should prepare to make the choice when that time comes, I will

11

explain why I think that, as surprising as it may be, the correct construction of the due-course clause's substantive scope remains a fully open question in this Court.

## II

The happenstance that all roads lead to Rome in this case still leaves open, as to due course, the key question of when that clause will protect a substantive right. The reason we should focus on this question—or at least acknowledge that it *is* a question—is because it is all too easy to build precedent upon precedent without checking the foundation. In my view, we still lack a strong foundation, which is why I regard the scope of the due-course clause to remain an open question.

## A

As the Court correctly notes, *see ante* at 9 n.16, our recent decision in *Patel* could not and did not reach that crucial first question of whether the due-course clause even applies. In *Patel*, all sides assumed for summary judgment and appeal that the due-course clause substantively protected the threaders' claimed rights. *Patel* "is a precedent of this Court and warrants respect." *Mitschke v. Borromeo*, ___S.W.3d___, 2022 WL 1510317, at *6 (Tex. May 13, 2022).

But what is *Patel* a precedent *about*? The one thing that *Patel*'s litigation posture ensures is that our decision lacks any precedential authority as to the clause's *scope* or what the clause *means*. Instead, the decision concerns the *second* question that arises in a due-course case: *assuming* (as the Court in *Patel* had to do) that the clause applied, what standard of review should the courts use? Even as to that more limited question, the Court repeatedly confined its analysis to the challenged statute's context of economic regulation. *See Patel*, 469 S.W.3d at 80,

12

87. And while it held that "for the most part" the due-course clause "align[s] with the protections found in the Fourteenth Amendment," *id.* at 86, the Court also concluded that, at least for as-applied challenges to statutes like the one at issue there, the standard was higher. In such a case, if the statute's application is "so burdensome as to be oppressive," *id.* at 87, the courts will not enforce it.

All of that is to confirm that, by relying on the assumed answer to the first question, *Patel* could not address whether the due-course clause provides any substantive protection. In today's case, unlike in *Patel*, the government *does* challenge whether the clause's substantive scope reaches the claimed interest. But because the interest claimed by Appellees would not be protected under *any* approach to due-course jurisprudence, it turns out that this case provides us with barely more opportunity than in *Patel* to draw meaningful lines.

That being said, I recognize that *Patel* does include some discussion—relevant to its standard-of-review holding—that might seem applicable to the threshold question that *Patel* could not decide. Given the limited scope of the question presented, it is not surprising that the parties in *Patel* did not thoroughly brief the original public meaning of the due-course clause. It is no criticism of *Patel*—and I disclaim any such criticism—to note that the Court had little with which to grapple.[5] Considering the posture of the case, the Court went as far

---

[5] The briefing that the Court did receive on the history and context of "due course" came from an amicus—Professor Charles W. "Rocky" Rhodes's 2014 State Constitutional Law Class. That brief provides an excellent example of how an "amicus curiae"—in its true sense of "friend of the court"—can greatly aid the Court in its consideration of murky legal questions. *See* Brief of South Texas College of Law 2014 State Constitutional Law Class as Amicus

13

as it could in addressing the standard-of-review question.

It remains important, however, to confirm that we cannot lift *Patel*'s discussion into the substantive context. *Patel* cited only five of this Court's cases from the forty-year period following the Constitution's 1876 enactment. Whatever those cases may say about what *standard* we should use when the clause *does* apply, none supports giving the due-course clause a broad substantive scope.

The earliest of these cases was *Milliken v. City Council of Weatherford*, 54 Tex. 388 (1881). *Patel* describes *Milliken*, which was decided five years after the new Constitution's promulgation, as "exemplif[ying]" the "hasten[ing] development of substantive due process." *Patel*, 469 S.W.3d at 83. According to *Patel*, in *Milliken*, "[t]he Court concluded that the city could not prohibit prostitutes as a class from renting rooms because such action would be 'unreasonable and in contravention of common right.' Although the court did not mention 'due course' or 'due process' of law, its supporting citations included Article I, § 19." *Id.* at 84 (quoting *Milliken*, 54 Tex. at 394). The fact that *Milliken* "did not mention" the due-course clause is because—as *Milliken*'s other citations reveal—the Court in *Milliken* was not focused on substantive due process. Rather, it was focused on the division of authority between municipalities and the State.

*Milliken*, for example, relies on Thomas M. Cooley, *Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (4th ed. 1878). Cooley had a whole chapter on due-process protections, id. at 435–527—but *Milliken* did not cite

Curiae, *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69 (Tex. 2016) (No. 12-0657).

14

that chapter. Instead, it cited Cooley's chapter on municipal government. *Milliken*, 54 Tex. at 394 (citing "Cooley's Const. Lim. (4th ed.), 246.").[6] After all, municipal power came from a highly limited delegation via a charter as a corporation created by the State; for any exercise of that power to be valid, it could not be divorced from its State-approved objective.[7] That test is not about due course but about municipal overreach.

The other authorities on which *Milliken* relies only reinforce this focus on municipal limitations. *Milliken*'s other secondary source, in fact, was John F. Dillon, *The Law of Municipal Corporations* § 259.[8] Dillon and Cooley, in turn, supplied *Milliken* with many of the cases it cited, which likewise concerned municipal limitations.[9] Far from

---

[6] Cooley notes that municipal power was subject to several restrictions. The most important of them, for present purposes, is that "[m]unicipal by-laws must also be reasonable. . . . To render them reasonable, they should tend in some degree to the accomplishment of the objects for which the corporation was created and its powers conferred." Cooley*, supra*, at 243–44.

[7] *See id.* at 257–58.

[8] *Milliken* does not identify the edition that it cites, but § 259 in the 1873 second edition is titled "Must not Contravene a Common Right." In the third edition (1881), § 259 concerns the validity of corporate meetings and does not appear relevant.

[9] For example, in *Austin v. Murray*, the court held that the town by-law totally banning bringing in any dead for interment in the town was "wholly unauthorized *by the act of the legislature*" empowering the town board to make rules about interment of the dead. 33 Mass. 121, 124, 127 (1834) (emphasis added). The other cited cases, with similar import, were *Hayden v. Noyes*, 5 Conn. 391 (1824); *Dunham v. Trs. of Rochester*, 5 Cow. 462, 466 (N.Y. Sup. Ct. 1826); *Hayes v. City of Appleton*, 24 Wis. 542, 543–44 (1869); and *Barling v. West*, 29 Wis. 307, 315–16 (1871).

The lone cited case that did not concern a municipal ordinance is *Chy v. Freeman*, 92 U.S. 275 (1875). A California statute gave authority to a "Commissioner of Immigration" to "satisfy himself" that non-citizen passengers

fostering any sense that our Court believed itself to be embarking upon a substantive-due-process endeavor, they suggest the opposite—that if there was a forbidden economic (or other) encroachment, the main problem was that the *municipality* had exceeded its delegated authority.

*Patel*'s next case was *Houston & Texas Central Railway Co. v. City of Dallas*, 84 S.W. 648 (Tex. 1905), another municipal-ordinance decision, there concerning railroads. These municipal cases show no general right to substantive-due-process review against the State, but reflect a check to ensure that authority delegated by the State is being carried out according to the law of the State. To put it mildly, *Milliken* and *Houston & Texas Central* are not foundational pillars for Texas due-course jurisprudence.

*Patel* also cited *Mellinger v. City of Houston*, 3 S.W. 249 (Tex. 1887), describing that case as holding "that Article I, § 19 was not violated under the facts of that case because of the [U.S.] Supreme Court's interpretation of the Fourteenth Amendment in a similar case." 469 S.W.3d at 84. The similar case? *Campbell v. Holt*, which held that there is no vested right in a statute-of-limitations defense. 115 U.S. 620, 628 (1885). *Mellinger* and *Campbell* held only that the respective "due course" and "due process" provisions do not protect mere expectations of a benefit under a statute until the interest has been acquired in hand.

A fourth case cited by *Patel*—some thirty-eight years after the

---

considered to have undesirable traits could not come ashore without a bond for indemnification for the care of the person for two years. *Id.* at 277. It also attached all kinds of processing fees to be recovered by an official under the commissioner, some of which the official could keep personally. *Id.* at 278. The Court held the state statute void because it invaded the power that the Constitution expressly granted to Congress concerning "the admission of citizens and subjects of foreign nations." *Id.* at 280.

16

Constitution's enactment—was not even a due-course case, but one finding a violation of both the federal and Texas *contract* clauses. *St. Louis Sw. Ry. Co. of Tex. v. Griffin*, 171 S.W. 703, 704–07 (Tex. 1914). And in a fifth case from this Court that *Patel* cited—*Mabee v. McDonald*, 175 S.W. 676 (Tex. 1915), now thirty-nine years post-promulgation—the Court explained that the federal and state due-course clauses were essentially identical but that neither had been violated. *Id.* at 680, 695.[10]

## B

The foregoing analysis only confirms that *Patel* had no occasion to consider the due-course clause's substantive scope. Yet what about our other precedents on the due-course clause? *Mellinger* and *Mabee* reflect the gist of them—this Court's frequent description of our due-course clauses as largely synonymous with the federal due-process clause. *Mellinger* came shortly after the due-course clause was ratified in 1876, and for that reason alone warrants attention. The Court openly stated that the due-course clause "must be held" to be coterminous with the federal due-process clause's restrictions as announced by the U.S. Supreme Court. *Mellinger*, 3 S.W. at 252–53. Several decades later, the Court again asserted that the federal due-process clause and our due-course clause, "according to the great weight of authority, are, in nearly if not all respects, practically synonymous." *Mabee*, 175 S.W. at 680.

Our cases have repeatedly and recently drawn this link between

---

[10] *Patel* states that *Mabee* was reversed on other grounds, 469 S.W.3d at 84, but the U.S. Supreme Court did reverse on due-process grounds (not other grounds), *see McDonald v. Mabee*, 243 U.S. 90, 92 (1917). So beyond formally being a dead letter, *Mabee* perhaps also inadequately understood the Fourteenth Amendment.

17

the due-course and due-process clauses. Even *Patel* did so (with its caveat) as to the proper standard of review, exactly one century after *Mabee*. *Patel*, 469 S.W.3d at 86 (due course, "for the most part, align[s] with" federal due process). The Court today acknowledges both the traditional link between the due-course and due-process clauses while reiterating that federal cases are not necessarily dispositive: "Because the U.S. Constitution's 'due process' clause uses language similar to the Texas Constitution's 'due course' clause, *we may find guidance* in the federal courts' due-process decisions." *Ante* at 10 n.17 (emphasis added) (citing *Villarreal*, 620 S.W.3d at 905).

As I see it, this Court's cases about the relationship between the federal and state clauses fall into three general categories:

- First, this Court has explicitly said that § 19 is "without meaningful distinction" from the Fourteenth Amendment's due-process guarantee.

- Second, many cases have treated § 19 and the Fourteenth Amendment as the same without expressly saying so or appearing to give any thought to the question.

- Third, we have recognized the possibility of independent meaning—in two cases, nearly a century apart.

The first category is familiar enough—it begins with *Mellinger* and *Mabee*. Nine decades later, their express statements of federal synonymity were revived in *University of Texas Medical School at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) ("While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," we regard these terms as without meaningful distinction.") (citing *Mellinger*). We have repeated that language, or

18

language like it, frequently since *Than*.[11]

The second category—cases that seemingly without analysis or thought treat the two provisions (or indeed any other state's comparable provision, too) as interchangeable—may well have a causal relationship with the first category. That is, the early decisions may explain why the bar and the Court thought that there was little point in seeking to distinguish the two clauses. Likewise, the accumulation of cases in this second category may have caused the more recent decisions, like *Than*, in which we started reiterating that the two clauses are essentially the same. This second category of cases includes too many to list, but here is a sampling: *White v. White*, 196 S.W. 508, 511–12 (Tex. 1917); *State v. Ball*, 296 S.W. 1085, 1088 (Tex. 1927); *Railroad Commission v. Texas & Pacific Railway Co.*, 157 S.W.2d 622, 626 (Tex. 1941); *House of Tobacco*, 394 S.W.2d at 657 (from 1965); *Tarrant County v. Ashmore*, 635 S.W.2d 417, 422 (Tex. 1982).

Still other cases in this category reflect a sense of a general common law of due process. Particularly in the pre-*Erie* era, our cases often cited other states' and the U.S. Supreme Court's due-process and due-course cases, implying that there was no particular expectation of a siloed doctrine specific to each state's constitutional text. *See, e.g.*, *Hurt v. Cooper*, 110 S.W.2d 896, 901–04 (Tex. 1937) (citing Idaho, Oregon, South Carolina, Michigan, and District of Columbia cases); *City of New*

---

[11] *See Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) ("Our due course clause is nearly identical to the federal due process clause . . . ."); *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019); *E.A. v. Tex. Dep't of Fam. & Protective Servs.*, 587 S.W.3d 408, 408 n.1 (Tex. 2019); *Wallace v. Tex. Dep't of Fam. & Protective Servs.*, 586 S.W.3d 407, 408 n.1 (Tex. 2019); *Horton v. Tex. Dep't of Fam. & Protective Servs.*, 587 S.W.3d 12, 13 n.1 (Tex. 2019).

*Braunfels v. Waldschmidt*, 207 S.W. 303, 304, 309–11 (Tex. 1918) (relying on U.S. Supreme Court and several states' cases); *Eustis v. City of Henrietta*, 39 S.W. 567, 569 (Tex. 1897) (citing several states' cases for the proposition that a law was void under § 19, the Fourteenth Amendment, and Article VIII, § 13 of the Texas Constitution).

The third and by far smallest category includes two cases that explicitly acknowledged at least a theoretical difference in scope between § 19 and the Fourteenth Amendment. In *Hutcheson v. Storrie*, we stated that "if the action now undergoing investigation is violative of the constitution of the United States, it is more palpably a violation of the plainer provisions of the constitution of the state of Texas." 51 S.W. 848, 850 (Tex. 1899). *Hutcheson* did not explain what—if anything—it meant for the Texas due-course clause to be "plainer" than its federal counterpart. It took nearly a century for the Court to return to this theme. In *In re J.W.T.*, the Court stated that "our Texas due course of law guarantee . . . has independent vitality, separate and distinct from the due process clause of the Fourteenth Amendment to the U.S. Constitution . . . ." 872 S.W.2d 189, 197 (Tex. 1994).[12] *J.W.T.* did not evaluate § 19's textual foundation and purported to be only a *procedural* decision. *Id.* at 195.[13] And the issue at stake was the highly unusual one in which a biological father was claiming the right of contact with his biological child. *Id.* at 189–90. As then-Justice Hecht's concurrence

---

[12] Chief Justice Phillips, who otherwise joined the Court's opinion, did not join footnote 23, in which the Court suggested that the due-course clause may have been broader than the due-process clause.

[13] Justice Enoch's dissent contended that "[u]nder the guise of denial of procedural due course of law, the Court is in fact creating a substantive due course of law interest . . . ." *Id.* at 200 (Enoch, J., dissenting).

stated, "parenthood is a constitutionally protected interest," *id.* at 199 (Hecht, J., concurring in judgment).[14]  This unusual area of law is not typically one in which we can derive general principles.  And without much more support than these two cases, this category looks fairly illusory, leaving the synonymity theory in front even if by default and even if it lacks much reasoning or analytical support.

I fear that our repeated equation of due course and due process, intoned so often without any thought or analysis at all, leaves us without mooring.  "A grave threat to independent state constitutions . . . is lockstepping: the tendency of some state courts to diminish their constitutions by interpreting them in reflexive imitation of the federal courts' interpretation of the Federal Constitution."  Jeffrey S. Sutton, *51 Imperfect Solutions* 174 (2018).  Yet it surely also is a "grave threat" to our Constitution to resolutely *insist* on there being a difference if none was intended.  Perhaps that is a *graver* threat, since judicial imposition of distinction that lacks any historical or textual support is an encroachment on the rights of the People and the other branches.

### III

One way or other, though, a reasoned decision about the due-course clause's scope will have to come, and soon.  I will not endorse any particular view of that question outside a case that squarely presents it, and even then only with full briefing.  But in anticipation of such a case,

---

[14] Justice Blacklock likewise has recently suggested that rights like the parental bond with a child are so engrained in what it means to be a free human being that they exist without separate expression.  *See In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (Blacklock, J., concurring in the denial of review) (acknowledging that our law recognizes the protection of this bond, which precedes the law itself).

I describe one potential resolution: the possibility, referenced in Part I.D above, that the due-course clause was written to be an important procedural limitation yet not a freestanding font of substantive rights. This reading may be consistent both with precedent and text; it may have the additional benefit of allowing the Court to *use* rather than to discard our precedents equating federal due process and Texas due course. This approach has received minimal discussion, however, especially compared to the other three approaches that I discussed in Part I. We could not responsibly resolve the larger question *without* considering a process-focused reading of the clause, and I therefore describe it here so that it will not be missed—or addressed too late— when a proper case comes to us.

## A

Under the due-course-clause-as-procedural-limitation approach, it may well be that our 1876 due-course clause *was* meant to encapsulate the same principles as the 1868 federal due-process clause. In truth, it is easy to imagine that those who ratified the 1876 Constitution expected this result, and there is some real evidence of it beyond this Court's precedents.[15] So for purposes of this discussion, I will take the equation at face value and assume its accuracy (while remaining fully open to that assumption being proven wrong).

That starting point, however, does not take us very far. The next question is what effect changing federal due-process notions ought to have on the Texas due-course clause. Even if the People of Texas thought that the two provisions meant the same thing at the outset, I

---

[15] *See infra* Part IV (further discussing the analysis of the historical evidence).

suspect that the People intended our clause to keep that meaning fixed, regardless of what federal courts might eventually say about the due-process clause.

For the due-course clause to mean today what it meant in 1876 should seem normal, not odd. The consistent meaning of unchanged legal texts should be a common feature of *all* legal enactments, not just constitutions. *See, e.g.*, *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.") (internal citations and punctuation omitted).

Thus, even if Texans in 1876 thought that they could enshrine federal due-process values into our Constitution, it does not follow that the due-course clause must forever march to the beat of the U.S. Supreme Court's drum. It was foreseeable in 1876 that the U.S. Supreme Court might take a constitutional detour; must the Texas Constitution go along for the ride?

I doubt it. The opposite is more likely true. The value in locking down the original meaning of the due-process clause within the due-course clause would be as a hedge against the possibility that the federal understanding of the federal due-process clause would go astray. If Texas courts must resolutely interpret the Texas due-course clause to follow every federal fad, though, this hedge would be illusory. Why even have a due-course clause if its meaning must yo-yo up and down with the changing views of any five U.S. Supreme Court Justices? Nothing useful could come from such mimicry. Texas courts already can and do—indeed, must—uphold federal constitutional guarantees. *See* U.S.

23

Const. art. VI, § 2.

But as Chief Judge Sutton has put it, state courts "may interpret their own constitutions to provide *less* protection than the US Constitution offers." Jeffrey S. Sutton, *Who Decides?: States As Laboratories of Constitutional Experimentation* 141 (2022). Even in the context of a state constitutional provision that adopts the original meaning of a federal provision, that principle would suggest rejecting the ratchet approach in which state constitutions must have *at least* the substantive scope that the Supreme Court claims for the federal Constitution, or perhaps more. In such a "skewed market," "state courts innovate only in granting *more rights* under their constitutions. The only way in which state court federalism helps the country is when state courts engage constitutional rights in both directions, registering respectful disagreement with some federal decisions and creating prompts for new decisions." *Id.* at 142.

Staying the course on the original meaning of the due-process clause would make sense if we conclude that those who framed and ratified our Constitution never viewed the judiciary as empowered to change settled constitutional understandings. How much less likely would Texans in 1876 have delegated such power to Justices of the *U.S.* Supreme Court? *Mellinger* expressed great deference to that Court's construction of the due-process clause, at least in dicta, *see* 3 S.W. at 252–53, but I see nothing in that statement to consign the due-course clause to eternally chasing federal standards.[16]

---

[16] The Court's dicta seemed to suggest that the Texas Constitution's due-course clause could be understood with a reasonable degree of reliance on then-contemporary U.S. Supreme Court cases. That may be another way of

**B**

Even if the due-course clause meant to embody the original meaning of the Fourteenth Amendment's due-process clause, at least two further serious questions arise.

First, what did those who ratified the Texas Constitution in 1876 think that they were getting by locking down the federal due-process guarantee? With full recognition of how fraught and contested that question is,[17] I will continue the hypothesis for present purposes: that due process, and thus due course, had a primarily procedural import in 1876. The case law briefly surveyed above and the structural aspects of the Texas Constitution described below, along with the text itself, could buttress such a reading. This hypothesis may well be proven wrong using the tools discussed in Part IV below, but it surely warrants consideration.

Second, and relatedly, if the 1876 enactment anticipated a powerful yet purely procedural role for the due-course clause, what would that mean for our law—and for our liberty? At first blush, one might assume a substantial change. I am less sure of that.

One can readily agree that Texans have inalienable rights, whether included in a constitution or not. Then-Justice Willett's elegant

---

suggesting that the meaning of the due-course clause was consistent with the federal guarantee, fixed at that time. Such an understanding would not authorize Texas judges to "discover" new rights lurking within its text.

[17] Of course, this analysis will require historical assessments not only of the Texas Constitution of 1876 but also the due-process clause enacted in 1868. The debates over the original public meaning of that provision continue to rage, but I will resist the temptation to enter those debates here or to describe the U.S. Supreme Court's long and winding history of giving meaning to that clause. In future cases, to the extent that it informs the meaning of the due-course clause, I hope that parties, advocates, amici, and scholars will bring their best arguments to bear.

25

and stirring concurrence in *Patel* provides a wonderful defense of the inherent rights of us all. *See, e.g.*, 469 S.W.3d at 92–93 (Willett, J., concurring) ("Liberty is not *provided* by government; liberty *preexists* government. It is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable."). Texans tend to think of rights being "recognized," not "granted," by our Constitution. The real question, however, concerns the lawful role for *judges*. Basic to our system is the principle that judicial power is limited to what the People have delegated to the judiciary. The judiciary, while certainly different from the policymaking branches, is still part of the government. And like every other part of the government, the judiciary derives *all* its powers from the People alone. The People adopted the due-course clause and created a judicial system to enforce it. *If* the People placed only procedural protections within that clause, the judiciary would have no proper authority to say otherwise.

But the citizens of our State have many other tools at their disposal, including other ways to authorize judges to vindicate individual liberties. A procedural understanding of due course, in other words, hardly means that the Texas Constitution could not robustly protect liberty. To think that liberty can only come from judicially mining substantive rights from the spare phrase "due course of the law of the land" is an impoverished view of liberty and of our Constitution.

Quite unlike the federal Constitution, our State's Constitution already contains a rich repository of carefully written, detailed, well-known, expressly stated, unambiguous individual liberties. Freedom of speech, freedom of worship, protection from searches and seizures—all of these and more are provided with much greater detail than their

26

federal analogues. *See* Tex. Const. art. I, §§ 6, 8, 9. Our People continue to add to the Constitution, too—eight more amendments last year, and two more just last month. "[O]ur Texas Constitution is quite lengthy and frequently amended. When Texans want to provide substantive constitutional protection . . . , they are not shy about saying so expressly*." Villarreal*, 620 S.W.3d at 909–10 (footnote omitted).[18] Our Framers provided for these amendments. Thus, our Constitution *also* recognizes far lesser-known rights, like public beach access, Tex. Const. art. I, § 33, and the right to hunt and fish, *id.* § 34. The People added this hunting-and-fishing right to our Constitution's Bill of Rights only six-and-a-half years ago, illustrating how active they are in articulating the rights that Texas courts must enforce.[19]

Even more obscure constitutional provisions reflect the People's ability to preserve rights without courts stretching to find them. In *City of Dallas v. Trammell*, 101 S.W.2d 1009 (Tex. 1937)—a case that the Court cites, *see ante* at 12—we held that public-retirement benefits were not vested. The People responded by adding what is now Article XVI, § 66(d), which prohibits reducing or impairing public-pension-payment amounts. Better appreciation of our *entire* Constitution would well serve the development of our law.

---

[18] The omitted footnote quantifies the difference: While "the Texas Constitution contains approximately 86,000 words and has been amended nearly 500 times since 1876," its federal analogue "has a mere 4,543 words and has been amended only twenty-seven times since 1789." *Id.* at 910 n.6.

[19] The proposed amendment went to the ballot as Proposition No. 6, where it won by a sixty-two-point margin—81% to 19%. *See* Office of the Secretary of State, Race Summary Report for 2015 Constitutional Amendment Election, https://elections.sos.state.tx.us/elchist190_state.html (November 3, 2015). Now it is part of our fundamental law. *See* Tex. Const. art. XVII, § 1 (amendment process).

Under these circumstances, our distinct Texas constitutional tradition seems to provide some evidence that the judiciary exists to protect rights that are textually expressed, but *not* to discover new ones in the due-course clause itself. A tradition in which judges dispense rights from comparatively vague texts is not self-evidently more pro-liberty than a tradition in which the People themselves decisively stand at the helm.

With greater specificity comes greater clarity about *when* the judiciary should act. A robust role for the judiciary, like the one described in *Patel* by Justice Willett, can be every bit as powerful—perhaps more—when the judiciary uses concrete provisions that directly protect liberty.

If the hypothesis that the original meaning of "due course" (and "due process") was primarily procedural is right, *saying so* could advance our law's clarity and predictability, not to mention the core principles of self-government. Our federal experience, with its comparative paucity of textually expressed rights, has led to an instinctive resort to due-process-type litigation. Such litigation prioritizes *judge*-centered questions (like what deeper truths might be lurking within the textually vague phrase "due course"). Moving away from that instinct would lead toward *text*-centered questions about the meaning of the Texas Constitution's many and varied substantive provisions. It would also encourage the People to remain vigilant about governing themselves rather than assuming that courts will supply any desired deficiency.

Or, I cheerfully recognize, perhaps all of that is wrong. Maybe something quite different should be the true doctrine of our due-course clause. In other words, we have a lot of work to do. It is fortunate that

today's case does not require us to plumb these depths. But we must be prepared for the arrival of cases that demand far more from us. To that end, I turn, finally, to some of the tools that will help us discern the proper meaning of the due-course clause, whether it is the framework I describe above or something fundamentally different.

## IV

To determine what "due course of the law of the land" means today, we need to know what those words meant to the Texans who agreed in 1876 to incorporate that provision within our current Constitution. Analyzing that question will facilitate our ability to meaningfully and accurately describe the due-course clause's proper role within our constitutional order. I therefore conclude with some preliminary and non-comprehensive thoughts about how that analysis might unfold.

Perhaps most importantly, the history of the clause in our Constitution warrants careful assessment. Neither this Court nor the larger legal community were strangers to the phrase "due course" when the 1876 Constitution came into force. That phrase was common enough, not least because it was part of our prior Constitutions. Examining the use of that phrase in the time leading to the current Constitution's ratification may provide considerable persuasive force even if it is not necessarily dispositive.

In the run-up to the 1876 ratification, our cases seem to largely use that phrase in a procedural sense. Sometimes the cases directly applied current § 19's predecessor (Article I, § 16 of the Texas

29

Constitution of 1869),[20] and sometimes they used the phrase in other and more generic contexts.[21] Perhaps countervailing usages or explanations would rebut the sense that there was any *limitation* to procedural contexts. My point is that I hope we will learn, with much greater certainty than we have today, how "due course" was understood at the time of ratification. Likewise, it will be important to know if there is a textually and historically reasonable basis to discern any *departure* from whatever the existing usages were.[22]

The records of the convention and ratification may provide further evidence. No member of the convention or any other historical figure warrants dispositive weight because of any personal views, but as with the federal Constitution, the history surrounding the drafting and ratification can provide overwhelming evidence of the original public understanding of the text.[23] Importantly, these materials are likely now

---

[20] *See, e.g.*, *Honey v. Graham*, 39 Tex. 1, 8 (1873) ("[T]he incumbent can only be deprived of his office in the manner pointed out in the above quoted section of the constitution.").

[21] *See, e.g.*, *Evans v. Bell*, 45 Tex. 553, 555 (1876) ("[H]e merely stipulates thereby that the note is collectable in due course of law by use of reasonable diligence.").

[22] For example, the 1869 due-course clause included "privileges." Tex. Const. of 1869 art. I, § 16 ("No citizen of this State shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land."). Only in 1876 was the phrase "or immunities" added. Does that addition tell us anything new or different about what "due course" itself means? Or does it simply confirm that, to the extent something qualifies as a "privilege" (a separate inquiry), the state cannot deprive someone of it absent compliance with the long-established understanding of "due course" protections?

[23] *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 386 (2010) (Scalia, J., concurring) ("Of course the Framers' personal affection or disaffection for corporations is relevant only insofar as it can be reflected in the

more accessible than ever before to the widest range of Texans who wish to read them.[24]

Moreover, any investigation into the original public meaning of "due course of law" must acknowledge that the 1876 Constitution uses that phrase *twice* in the Bill of Rights. Section 13 provides that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Indeed, *every* Texas Constitution since 1836 has included not just one but at least *two* "due course" clauses—the Texas Republic's Constitution used "due course" *three* times.[25] Our cases typically treat them as wholly distinct: "We have also held that Article I, § 13 and Article I, § 19 are different provisions providing separate guarantees." *LeCroy v. Hanlon*, 713 S.W.2d 335, 341 (Tex. 1986). Section 13's reference to "due course," for example, was not cited by *any* of the four opinions in *Patel* and was cited by none of the briefs in this case, either. Before we finally resolve what § 19's due-course clause means, we

---

*understood meaning of the text they enacted*—not . . . as a freestanding substitute for that text.") (emphasis added).

[24] The University of Texas School of Law's Tarlton Law Library's Jamail Center for Legal Research has a wealth of primary sources available at, *e.g.*, https://tarlton.law.utexas.edu/constitutions/introduction. Dedicated archivists have, among other things, digitized Texas' historical constitutions and the journals and debates of the constitutional conventions, which are all available through tabs shown at that link.

[25] Repub. Tex. Const. of 1836, Declaration of Rights, cl. 6 (protection "[i]n all criminal prosecutions" against being "deprived of life, liberty, property, but by due course of law"); *id.* cl. 7 ("No citizen shall be deprived of privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land."); *id.* cl. 11 ("All courts shall be open, and every man for any injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law.").

31

should at least ask if the use of that exact phrase only six sections earlier within the same Bill of Rights may shed any meaningful light. Likewise, if contemporaneous or existing statutes used "due course" or defined what "due course" would be for certain rights, that might be useful evidence of accepted usage.

As alluded to above, other states' constitutions frequently have used the phrase "due course."[26] There appears to be evidence that our Framers and Ratifiers consciously drew from and sought to remain basically consistent with this larger body of law. Treatises like Cooley's surveyed many cases from other jurisdictions; our (and other states') courts then used those treatises and cases. Particularly those sources in common use by Texas courts may help reflect the prevailing understanding of how due-course provisions properly operated. Usage drawn from English law's references to "due course" will likely be informative, too.

What came soon *after* enactment may also point to the original meaning. Cases, treatises, and legal publications could help sketch the then-new text's contours. Even if the text proves indeterminate, settled post-enactment practice may prove instructive. *See* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–35 (2019) (explaining the theory of so-called "liquidation" of constitutional provisions via

---

[26] *See, e.g.*, Ala. Const. of 1819, art. I, §§ 10, 14; Conn. Const. of 1818, art. I, §§ 9, 12; Del. Const. of 1831, art. I, § 9; Ind. Const. of 1816, art. I, § 11; Ky. Const. of 1799, art. X, § 13; Me. Const. of 1820, art. I, § 19; Miss. Const. of 1832, art. I, §§ 10, 14; Ohio Const. of 1802, art. VIII, § 7; Pa. Const. of 1790, art. IX, § 11; Tenn. Const. of 1835, art. I, § 17. Usage in those and other states may help us understand what "due course" traditionally required. That understanding, in turn, may help us determine whether there is good reason to depart from that tradition because of any Texas peculiarity, whether in our existing law or in the constitutional drafting and ratifying process.

established practices); *id.* at 50–51 (considering the possibility of applying liquidation to individual rights).

Such methods of analyzing the text are, of course, by no means exhaustive. And as to them or others, advocates will need not start from scratch. Scholars have been working to unravel the knotted meaning of "due process," "due course," and "law of the land" at the time of the U.S. Constitution's Founding. *See, e.g.*, Max Crema & Lawrence B. Solum, *The Original Meaning of "Due Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447, 462 (2022) ("Simply put, 'course of law' meant legal procedure, covering the entirety of a legal proceeding from initiation through to judgment and execution."). Such work could inform, at least as a starting point, the question of how the phrases had evolved by 1876. And if the Fourteenth Amendment ends up as the end-all-be-all of the due-course clause, then there is substantial scholarship there, too.[27] Of course, it is not scholarship per se that matters—what matters is the relevant and probative historical evidence that judges can use in the non-academic context of setting boundaries in deciding actual cases.

---

[27] I cannot survey the literature in this (already too lengthy) opinion, but I will mention several examples while readily acknowledging how many others merit such a mention. Ryan C. Williams argues the bulk of state-court practice—twenty of the then thirty-seven states—had some version of substantive due process with only two rejecting it. *The One and Only Substantive Due Process Clause*, 120 Yale L.J. 408, 469–70 (2010). And Randy E. Barnett and Evan D. Bernick have a new book complicating the picture. *The Original Meaning of the 14th Amendment: Its Letter & Spirit* (2021). They present substantive and procedural due process as a false dichotomy. By 1868, they argue, "due process" had begun to mix with "law of the land," and any legislative act had to comply with the "law of the land" before it itself could become "law." *Id.* at 273–75. And Ilan Wurman defends the conventional originalist view that due process of law was indeed about process, not substance. *See generally The Second Founding: An Introduction to the Fourteenth Amendment* (2020).

In the end, the purpose of my separate writing today is to encourage careful consideration of all the questions and scenarios that I have discussed and more. The stakes are too high for us to continue on the path of least resistance. We cannot build on foundations that are themselves merely assumptions. I thus echo Judge Oldham, who invites an "iterative" and "rigorous" process by scholars, lawyers, judges, and others so that, by the time a "constitutional question reaches [this] court" such that we must make a hard decision, "the range of possible meanings carried by [the due-course] clause is as narrowly circumscribed as" the evidence allows. Andrew S. Oldham, *On Inkblots and Truffles*, 135 Harv. L. Rev. F. 154, 172 (2022).

\* \* \*

The linchpin in the Court's decision today is that, to proceed any further, a party must identify a vested right that the due-course clause protects. *See ante* at 30–31. I am confident that, as to its conclusion, the Court has not departed from our precedents. No party has asked us to overturn those precedents. I am also confident that this result would follow from *any* available approach to the due-course clause. With these observations, I am pleased to join the Court's opinion and its judgment.


Evan A. Young
Justice

**OPINION FILED:** June 24, 2022

34