# Supreme Court of Texas

### No. 25-0674

In re Greg Abbott,

*Relator*

*~ consolidated with ~*

### No. 25-0687

In re State of Texas,

*Relator*

## On Petitions for Writ of Quo Warranto

JUSTICE SULLIVAN, concurring in the denials of the petitions.

Last summer, the Texas Legislature was crippled when members of the House of Representatives fled the State to deprive their chamber of a quorum. They returned to Austin two weeks later, before we could wield our "original jurisdiction . . . to issue writs of quo warranto." Tex. Const. art. V, § 3(a); *see also* Tex. Gov't Code § 22.002(a). Today the Court declines to oust the quorum-breakers from office with this discretionary power.

I concur because this constitutional crisis passed too quickly for us to engage in factfinding that might've justified quo warranto relief. But we should be prepared to perform this grave task if legislators refuse to do their jobs again in the future. To that end, I offer these preliminary thoughts on how such quo warranto proceedings might go.

**I**

The writ of quo warranto dates back to at least the thirteenth century. *See Paxton v. Annunciation House, Inc.*, 719 S.W.3d 555, 566 (Tex. 2025) (citing 1 W.S. Holdsworth, *A History of English Law* 87–88 (3d ed. 1922)). The writ allowed the king to demand that a person show by what authority (in Latin, "quo warranto") he supported his claim to an office or franchise. James L. High, *A Treatise on Extraordinary Legal Remedies, Embracing Mandamus, Quo Warranto, and Prohibition* 544 (3d ed. 1896). If the respondent couldn't produce a charter proving that he rightfully held the office, he was removed. *Id.* at 545; 1 Holdsworth, *supra*, at 88. The writ was returnable to the justices in eyre,[1] and as a result the ancient writ of quo warranto fell into disuse after that system of itinerant judging was abolished. *See* Baker, *supra*, at 156.

---

[1] To spread royal justice, kings had a practice of sending justices to travel throughout England. This took several forms, but by 1176, these itinerant justices were organized into circuits. The justices were first known as *justiciae errantes* (wandering justices) but later came to be known as *justiciarii in itinere* (justices in eyre). "Eyre" is a French word that means judicial circuit, but it came to represent the institution itself. At one point, this system "was the most visible form of royal justice," with large groups of people attending the judicial visits "either to account for themselves or to seek justice." *See* John Baker, *An Introduction to English Legal History* 19 (5th ed. 2019).

The ancient writ was supplanted by a "less cumbrous procedure," namely, "an information laid in the King's Bench by the attorney general." *Id.* This "information in the nature of a quo warranto" started out as a criminal proceeding. High, *supra*, at 555. "Despite its criminal-law roots, however, the information in the nature of quo warranto developed into a purely civil proceeding and remains exclusively civil today." *Annunciation House*, 719 S.W.3d at 567 (internal quotation marks omitted). The main difference between the new information and the ancient writ was that litigants could file directly with the King's Bench instead of having to wait for the justices in eyre to come to town. *Id.*[2] The information was so much more convenient that references to "a writ of quo warranto" came to refer to a proceeding by information and not to the ancient writ. High, *supra*, at 555.

The ancient writ of quo warranto was a "high prerogative writ," which meant only the king could use it. *Id.* at 544. The same was true of the information in the nature of quo warranto until 1710, when the Statute of Anne "authorized the filing of the information, by leave of court, upon the relation of any person desirous of prosecuting the same, for usurping or intruding into any municipal office or franchise in the kingdom." *Id.* at 554.

---

[2] Justices in eyre, to whom the ancient writ was returnable, were largely phased out by the 1330s. Baker, *supra*, at 23. King Henry VIII temporarily brought them back for the sole purpose of issuing writs of quo warranto. *Id.* at 156. But from that time until the information was abolished in 1938, the only writs of quo warranto issued in England were obtained by filing an information instead of by the ancient writ. England's last significant use of quo warranto occurred when Charles II sought to revoke the City of London's charter. *Id.* That case was prosecuted by an information, not the ancient writ. *R. v. City of London* (1682–83) 8 State Tr. 1039.

Quo warranto first came to Texas as part of the English common law adopted by the Congress of the Republic in 1840. Act of Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 3, 4, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 177–78 (1898). And it was constitutionalized in 1891, when the People ratified an amendment authorizing the Legislature to grant this Court original jurisdiction over such proceedings. S.J.R. 16, 22d Leg., R.S. (Austin, Gammel Book Co. 1891); *see* Tex. Const. art. V, § 3(a) ("The Legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except as against the Governor of the State."). The Legislature did so in 1892. Act approved Apr. 13, 1892, 22d Leg., 1st C.S., ch. 14, § 1, 1892 Tex. Gen. Laws 19, 21, *reprinted in* 10 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 385 (Austin, Gammel Book Co. 1898). The relevant statute now provides that "[t]he supreme court or a justice of the supreme court may issue . . . all writs of quo warranto . . . agreeable to the principles of law regulating those writs, against . . . any officer of state government except the governor, the court of criminal appeals, or a judge of the court of criminal appeals." Tex. Gov't Code § 22.002(a).

A different statute, originally passed in 1879 and modified only in form since then, allows the Attorney General, a county attorney, or a district attorney to bring quo warranto actions in a district court. Tex. Civ. Prac. & Rem. Code §§ 66.001–.003; *see also* Act approved July 9, 1879, 16th Leg., 1st C.S., ch. 48, 1879 Tex. Gen. Laws 43, 43–44, *reprinted in* 9 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 75–76 (Austin, Gammel Book Co. 1898). Almost all of this Court's quo

4

warranto cases began in a district court. Indeed, we've been asked just three times to exercise our original jurisdiction to issue a writ of quo warranto. We granted relief in none of them.

First came *State ex rel. McCall v. Manry*, a dispute between two candidates who both claimed the same office of district judge. 16 S.W.2d 809, 810 (Tex. [Comm'n Op.] 1929). Manry was elected to a four-year term but, before he could complete it, the Legislature reorganized the trial-court system and required that judges currently serving run again if they wanted to keep their seats. *Id.* He ran against McCall and lost. *Id.* Manry sued McCall in district court, which granted a temporary injunction prohibiting McCall from assuming the office. *Id.* at 811. Before the case went to trial, McCall invoked our original jurisdiction, filing an information in the nature of quo warranto that we accepted and referred to the Commission of Appeals for resolution. *Id.* at 811–12. McCall argued that the district court didn't have the power to decide election disputes via an injunction and urged us to resolve the dispute through our original jurisdiction to issue writs of quo warranto instead. *Id.* The Commission held that district courts could decide such cases through an injunction and that this Court had discretion to "decline to take further jurisdiction" of the case. *Id.* at 813–14. We adopted the Commission of Appeals' opinion and dismissed the case to let the parties pursue their remedies in the district court. *Id.* at 814.

Next was *State ex rel. Todd v. Martineau*. The law at the time allowed practicing attorneys to elect a "special judge" if the regular judge was temporarily absent, but not if he'd vacated his office. *State ex rel. Todd v. Martineau*, 171 S.W.2d 856, 857 (Tex. 1943). Judge Wood left

5

the State when he was commissioned as an officer in the U.S. Naval Reserve, and Martineau was elected special judge. *Id.* The district attorney filed an original quo warranto action arguing that Martineau had been illegally elected because Wood vacated his seat upon becoming an officer in the Naval Reserve. *Id.* In a somewhat cryptic opinion, we observed that the Legislature had also enabled county and district attorneys to file quo warranto actions in the district court, and then we concluded without much explanation that "a district attorney has no lawful authority to file a quo warranto petition in the Supreme Court." *Id.* We set aside our order permitting the relator to file an information in the nature of quo warranto. *Id.*

After we issued our opinion, the Attorney General moved to reinstate the case, apparently signaling that if his absence from the litigation was the reason why we refused to adjudicate the dispute, it needn't be. *State ex rel. Todd v. Martineau*, 173 S.W.2d 460, 460 (Tex. 1943). We overruled the Attorney General's motion, noting that special judges were only elected for eight-week terms and that it would be impossible for the case to be presented to us and decided in that short timeframe. *Id.* We reiterated that the action could be filed in district court but declined to decide whether that avenue was exclusive. *Id.*

Lastly there was *State ex rel. Angelini v. Hardberger*. There, Justice Hardberger announced in June 1996 that he intended to resign from the Fourth Court of Appeals effective January 1, 1997. 932 S.W.2d 489, 490 (Tex. 1996). A statute arguably made the resignation effective no later than eight days after the resignation letter was received, despite the announced intention to resign later. *Id.* at 491. Believing the office

6

to be vacant as a matter of law, the Governor appointed Karen Angelini to take Justice Hardberger's place on June 28, 1996. *Id.* at 490. Justice Hardberger refused to vacate his office until the date he'd specified. *Id.* The State filed an information in the nature of quo warranto seeking to have the office declared vacant. *Id.*

Our opinion began by characterizing our holdings in *Martineau* and *Manry* as ordinarily requiring "parties seeking quo warranto to first pursue their claim in district court" rather than invoking our original jurisdiction. *Id.* But we "exercise[d] our discretion to decide this matter without first requiring presentation to the district court" for three reasons: (1) time was of the essence; (2) if Justice Hardberger had vacated the office, his further actions would be invalid; and (3) there were no disputed issues of fact. *Id.* at 490–91. So we permitted the State to file the information, but "den[ied] the writ of quo warranto" because we interpreted the statute as not creating a vacancy until Justice Hardberger wanted one. *Id.* at 490–91, 495.

Although *Manry*, *Martineau*, and *Hardberger* leave many questions unanswered, they establish an important point: Our Constitution and laws have imported from England the information in the nature of quo warranto, not the ancient writ. I reviewed all three case files in the state archives and verified that each was litigated by way of an information in the nature of quo warranto. That's hardly surprising, given that the ancient writ hasn't been used in England since the sixteenth century. *See Annunciation House*, 719 S.W.3d at 566–67; High, *supra*, at 550–57.

7

When our Legislature first enacted a statute referring to "proceedings by quo warranto" in the district courts, moreover, the text expressly stated that those proceedings would take the form of an "information in the nature of a quo warranto." Act approved July 9, 1879, 16th Leg., 1st C.S., ch. 48, §§ 1, 3, 1879 Tex. Gen. Laws 43, 43, *reprinted in* 9 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 75, 75 (Austin, Gammel Book Co. 1898). That 1879 statute established "the necessity of proceeding by information in the nature of a *quo warranto*" and "expressly re-enacted in many of its essential features" England's eighteenth-century Statute of Anne. *Brennan v. City of Weatherford*, 53 Tex. 330, 336 (1880). It's safe to "presume that the Legislature acted with knowledge of th[is] background law and with reference to it," *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 137 (Tex. 2013), when it proposed the circa-1891 constitutional amendment concerning this Court's "original jurisdiction . . . to issue writs of quo warranto," Tex. Const. art. V, § 3(a).

## II

To exercise our original jurisdiction over an information in the nature of quo warranto, as the Governor and the Attorney General have requested here, this Court would have to resolve disputed issues of fact. Such a quo warranto proceeding would have us "correct the . . . non-user . . . of a public office," *Brennan*, 53 Tex. at 336–37, by removing quorum-breakers from the House due to abandonment, *see Honey v. Graham*, 39 Tex. 1, 15–16 (1873). As the Attorney General himself opined during the last quorum break, "[w]hether a specific legislator abandoned his or her office such that a vacancy occurred will be a fact question for a

8

court." Tex. Att'y Gen. Op. KP-0382, 2021 WL 3849510, at *2 (2021) (citing *Steingruber v. City of San Antonio*, 220 S.W. 77, 78 (Tex. Comm'n App. 1920, judgm't adopted)).

This Court, like our federal counterpart, is "structured to perform as an appellate tribunal[ and is] ill-equipped for the task of factfinding." *Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 498 (1971). And last summer's two-week quorum break hardly gave us enough time to complete this unfamiliar task. Now that the storm has passed, I'd be hard-pressed to argue that this nine-member tribunal should try its hand as a finder of fact. *Cf. Hardberger*, 932 S.W.2d at 490 (describing the absence of "disputed issues of fact" as a "compelling reason[ ] to exercise our discretion to decide" a quo warranto matter within our original jurisdiction). That said, I hope our Court will stand ready to put in that work the next time there's a quorum break and an ensuing information in the nature of quo warranto.

An appellate court that's been vested with original jurisdiction must have some way of trying the case before it. *See, e.g.*, *Texas v. New Mexico*, 602 U.S. 943, 975 (2024) (Gorsuch, J., dissenting) ("The Constitution vests this Court with original jurisdiction . . . , an awkward arrangement where we sit, in effect, as a trial court, a court of first (and last) review." (cleaned up)); *Original Jurisdiction*, Garner's Dictionary of Legal Usage (3d ed. 2011) ("[J]urisdiction to take cognizance of a case at the outset, to try it, and to decide the issues . . . usually contrasted with appellate jurisdiction . . . ." (emphasis omitted)). Recognizing as much, other high courts have come up with a variety of strategies for resolving factual disputes.

9

For example, early in its history, the U.S. Supreme Court "impanelled juries as a matter of course at the beginning of every Term," though it appears to have used those juries on just three occasions. Lochlan F. Shelfer, Note, *Special Juries in the Supreme Court*, 123 Yale L.J. 208, 210 (2013) (citing *Georgia v. Brailsford*, 3 U.S. (3 Dall.) 1 (1794)); *cf.* William Francis Bailey, 2 *A Treatise on the Law of Habeas Corpus and Special Remedies* 1277 (1913) ("At common law quite generally, issues of fact arising in quo warranto proceedings were triable by jury whether commenced in the supreme court under its jurisdiction or in a subordinate court."). Nowadays, it simply "appoints a special master to take evidence and prepare findings of fact." William Baude et al., *Hart and Wechsler's The Federal Courts and The Federal System* 350 (8th ed. 2025). Meanwhile, when the Wyoming Supreme Court is exercising original jurisdiction, it can direct a district judge to hold hearings and make findings of fact. Wyo. R. App. P. 20.

We could use any of the aforementioned strategies, or come up with a new one, to resolve factual disputes that arise during the exercise of our "original jurisdiction . . . to issue writs of quo warranto." Tex. Const. art. V, § 3(a). It's up to us, because "[t]he Supreme Court shall also have power, upon affidavit or otherwise *as by the court may be determined*, to ascertain such matters of fact as may be necessary to the proper exercise of its jurisdiction." *Id.* art. V, § 3(b) (emphasis added).[3]

---

[3] Our all-too-convenient refrain about how we can't resolve "doubtful question[s] of fact" has arisen in the mandamus context, not the quo warranto context. *Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930) (quoting *Teat v. McGaughey*, 22 S.W. 302, 303 (Tex. 1893)).

It's been argued that the quorum-breakers would have a right to a jury trial in any quo warranto proceedings before this Court. That right, if it exists, must be found in our Bill of Rights' decree that "[t]he right of trial by jury shall remain inviolate." Tex. Const. art. I, § 15.[4] We've long understood this provision to guarantee a jury if one would've been granted in 1876. *See Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 636 (Tex. 1996); *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 291 (Tex. 1975); *White v. White*, 196 S.W. 508, 512 (Tex. 1917); *Cockrill v. Cox*, 65 Tex. 669, 674 (1886); *see also Davis v. Davis*, 34 Tex. 15, 24 (1870) (construing the predecessor to Tex. Const. art. I, § 15).

The question, then, is whether a jury trial would've been granted upon request in quo warranto proceedings in 1876. My research has yielded no solid evidence either way. The election dispute in *Davis v. State ex rel. Wren* was tried without a jury, but it's not clear whether either party asked for one in the district court. 12 S.W. 957, 957 (Tex. 1889). My initial survey of our remaining quo warranto opinions yields no better answers.

If the issue had been settled in other States around the time our Constitution was adopted, that would suggest an answer. But it wasn't. Although every state constitution at the time provided for a jury-trial right, States in the late nineteenth century were split as to whether this right extended to proceedings on an information in the nature of quo

---

[4] Our Constitution contains two civil jury-trial rights: one in Article I and the other in Article V. *See* Tex. Const. art. I, § 15; *id.* art. V, § 10. But the latter provision applies only to trials "in the *district* courts." *Id.* art. V, § 10 (emphasis added).

warranto. *Compare Buckman v. State ex rel. Spencer*, 15 So. 697, 699–701 (Fla. 1894) (yes); *People v. Havird*, 25 P. 294, 295 (Idaho 1889) (yes), *aff'd on other grounds sub nom. Gorman v. Havird*, 141 U.S. 206 (1891); *People v. Albany & S.R. Co.*, 57 N.Y. 161, 174 (1874) (yes), *with State ex rel. Norton v. Lupton*, 64 Mo. 415, 417 (1877) (no); *State v. Johnson*, 26 Ark. 281, 292–93 (1870) (no); *see also State v. Allen*, 5 Kan. 213, 222–23 (1869) (maybe so, and ordering a jury trial just in case). Absent further scholarship, it seems that we can't point to a settled practice that our Bill of Rights would have rendered "inviolate." Tex. Const. art. I, § 15.

### III

Perhaps the most vexing question posed here is this: Who can seek quo warranto relief? One of the quorum-breakers argues that only the Attorney General, or district and county attorneys, may litigate on the State's behalf—not the Governor.

This position is undermined by the history outlined above. To review, the ancient writ of quo warranto was a prerogative writ that belonged only to the king. High, *supra*, at 544. At first, the information in the nature of quo warranto likewise could only be instituted by the king, acting through his attorney general. Baker, *supra*, at 156. But that changed with the Statute of Anne, under which anyone could seek leave to file an information. High, *supra*, at 554. And we've held that statutory references to a writ of quo warranto incorporate the essential features of the Statute of Anne. *See Brennan*, 53 Tex. at 336. Like the Statute of Anne, our first statute enabled the Attorney General "either of his own accord or at the instance of any individual relator" to request "leave to file an information in the nature of a quo warranto." Act

12

approved July 9, 1879, 16th Leg., 1st C.S., ch. 48, § 1, 1879 Tex. Gen. Laws 43, 43, *reprinted in* 9 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 75, 75 (Austin, Gammel Book Co. 1898). So perhaps anyone could file an information, not just one of the People's representatives. On the other hand, in that same case, we said that quo warranto proceedings could not be brought by private individuals, at least when it came to proceedings questioning the validity of a corporate charter. *Brennan*, 53 Tex. at 336; *see also Wright v. Allen*, 2 Tex. 158, 159 (1847) (reaching the same conclusion about a quo warranto election dispute).

Owing to the dearth of Texas cases, it'd be tempting to look to other States to get a sense of how the late-nineteenth-century American legal community would've understood a constitutional reference to "quo warranto." But States at that time were all over the place. Some held that private parties must have a particularized interest in the proceedings, such as a claimed right to occupy the office. *See Marian v. Beard*, 242 N.W. 880, 881 (Mich. 1932); *Meehan v. Bachelder*, 59 A. 620, 621 (N.H. 1904); *State ex rel. Antrim v. Reardon*, 68 N.E. 169, 170 (Ind. 1903); *Miller v. Town of Palermo*, 12 Kan. 14, 17 (1873). In Pennsylvania, it was held that not even a rival claimant to an office could institute quo warranto proceedings; only the Attorney General could. *See Commonwealth v. Cluley*, 56 Pa. 270, 275 (1867). In at least some places where quo warranto proceedings had to be instituted in the name of the State, private relators could litigate them if the attorney general refused to. *See Buckman*, 15 So. at 697.

In contrast, other States held that ordinary citizens could institute quo warranto proceedings, often on the theory that every

13

citizen has an interest in ensuring that those who claim authority to govern them actually have that authority. *See In re Sherwood*, 22 Haw. 385, 388 (1914); *State v. Barker*, 89 N.W. 204, 205 (Iowa 1902); *State ex rel. Nelson v. Mott*, 86 N.W. 569, 570 (Wis. 1901); *State v. Martin*, 46 Conn. 479, 482 (1878); *People ex rel. Hargrove v. Hilliard*, 72 N.C. 169, 170 (1875); *Mitchell v. Tolan*, 33 N.J.L. 195, 199 (1868). One state court even reasoned that ordinary citizens have a *greater* interest in instituting quo warranto proceedings than do competing office claimants. *See Churchill v. Walker*, 68 Ga. 681, 685 (1882) (citing *Hardin v. Colquitt*, 63 Ga. 588, 592 (1879)); *see also id.* at 684 ("[O]ffices are created by law for the benefit and convenience of the citizens, and if any usurper should assume their duties, can redress be had only through a contestant claimant? We think not.").[5]

Confusion on this issue seems to have been so rampant that one state court adopted *both* perspectives at various points in time. *Compare Voisin v. Leche*, 23 La. Ann. 25, 26 (1871), *with State ex rel. Saunders v. Kohnke*, 33 So. 793, 797 (La. 1903). And even in those States permitting ordinary citizens to institute quo warranto proceedings, the lack of a particularized interest was sometimes a reason for the court to exercise its discretion to withhold leave to file the information. *Robibero v. Hillery*, 58 A.2d 596, 597 (N.J. 1948); *State v.*

---

[5] It appears this is still the law in Georgia. *See Georgiacarry.org, Inc. v. Allen*, 791 S.E.2d 800, 802 (Ga. 2016) ("If the relator happens to be the defeated candidate, his right to file the information is in his capacity as an interested citizen, and not in his capacity of a defeated candidate." (quoting *Hathcock v. McGouirk*, 119 Ga. 973, 978 (1904))).

14

*Nohle*, 112 N.W. 141, 142 (N.D. 1907) ("[W]e will not assume [original quo warranto] jurisdiction . . . at the relation of private parties, except in cases which present some special reason or some special or peculiar emergency . . . ." (quoting *State v. Elliott*, 44 P. 248, 251 (Utah 1896))).

As discussed above, there is reason to believe that the ratifiers of our Constitution would've understood it to allow any private party to institute quo warranto proceedings in the State's name. The Statute of Anne allowed this, and our Court has treated statutory references from this time as modeled after that English enactment. *See Brennan*, 53 Tex. at 336. If that's true, it's quite plausible that the Constitution's use of "quo warranto" refers to the common-law information as modified by the Statute of Anne.

Admittedly, though, that view could be in tension with other legal principles. Giving a cause of action to some random member of the public who lacks a personal stake in the matter may be incompatible with the doctrine of constitutional standing. *In re B.I.V.*, 923 S.W.2d 573, 574 (Tex. 1996) (per curiam) ("To establish standing, a person must show a personal stake in the controversy."). And there may be separation-of-powers concerns with the Legislature authorizing private citizens to sue on the State's behalf, a power the Constitution gives to the Attorney General and to county attorneys and district attorneys. *See* Tex. Const. art. IV, § 22; *id.* art. V, § 21; *cf. In re Novartis Pharm. Corp.*, 722 S.W.3d 720, 721–22 (Tex. 2025) (statement of Young & Sullivan, JJ.) (raising these constitutional concerns with *qui tam* laws).

In short, this is a thorny issue that the parties to this litigation only began to untangle. If someone other than the Attorney General

15

comes to this Court seeking to invoke our original quo warranto jurisdiction, he'd do well to establish some special interest in the outcome. The Governor's quo warranto petition is an exemplar in this regard: Given his "unique constitutional status" as "*the superior* executive official" in Texas, the Governor "is not just first among equals." *Paxton v. Am. Oversight*, 716 S.W.3d 535, 549 (Tex. 2025). And it was he alone who controlled the call for the special sessions of the 89th Legislature that were hijacked by last summer's quorum-breakers. *See* Tex. Const. art. III, § 5; *id.* art. IV, § 40.

**IV**

When it comes to breaking quorum, maybe there won't even be a next time. After all, the People of Texas have made it perfectly clear that "[t]he Legislature *shall* meet every two years at such time as may be provided by law and at other times when convened by the Governor." Tex. Const. art. III, § 5(a) (emphasis added). "[W]hen the Constitution provides and commands that a thing *shall* be done, the matter must be done as directed, and neither the Legislature, Executive, nor the courts have the authority to set aside the mandates." *Ferguson v. Wilcox*, 28 S.W.2d 526, 533 (Tex. 1930) (emphasis added).

I won't be holding my breath, though, given the recent pattern of legislative walkouts here in the Lone Star State. It happened in 2003. *See* Brooks Landgraf, Comment, *The Golden Rule of Texas*, 9 Scholar 427, 432–38 (2007) (recounting 2003 quorum break in which members of the Texas House and Senate fled to Oklahoma and New Mexico to prevent passage of a congressional-redistricting bill). It happened again in 2021. *See In re Abbott*, 628 S.W.3d 288, 290 (Tex. 2021) ("Plaintiffs

16

. . . are members of the Texas House of Representatives who denied the House a quorum by fleeing the state on July 12, 2021. They broke quorum to prevent the legislature, in special session, from enacting voting legislation they oppose."). And then it happened again in 2025. *See LULAC v. Abbott*, 809 F. Supp. 3d 502, 620 (W.D. Tex. 2025) (Smith, J., dissenting) ("[Members of the Texas House] broke quorum and delayed passage of the 2025 map for weeks. . . . [They] should not get the benefit of the delay that *they* caused by breaking quorum.").

Were it to happen yet again, I believe the next set of quorum-breakers had better be ready to pay us a visit. Our original jurisdiction to issue writs of quo warranto will empower us to inquire whether they've abandoned their legislative offices and, if we so find, to throw them out. *Cf. State ex rel. Jones v. Lockhart*, 265 P.2d 447, 454 (Ariz. 1953) ("It is the judgment of the court that the defendant is guilty of usurping or intruding into the State Senate, . . . and he is therefore ordered ousted and excluded from said legislative body.").

James P. Sullivan
Justice

**OPINION FILED:** May 15, 2026

17